**UTAH COPPER CO. et al. v. RAILROAD RETIREMENT BOARD et al.**

**NEVADA CONSOL. COPPER CORPORATION et al. v. SAME.**

Nos. 2456, 2457.

Circuit Court of Appeals, Tenth Circuit.

June 30, 1942.

Rehearing Denied Aug. 11, 1942.

C. C. Parsons, of Salt Lake City, Utah (Wm. M. McCrea, of Salt Lake City, Utah, and Elmer L. Brock, of Denver, Colo., on the brief), for appellants Utah Copper Co. and others.

C. C. Parsons, of Salt Lake City, Utah (W. Howard Gray, of Ely, Nev., and Elmer L. Brock, of Denver, Colo., on the brief), for appellants Nevada Consolidated Copper Corporation and others.

Lester P. Schoene, of Washington, D. C., for appellee Railroad Retirement Board.

Willard H. McEwen, of Toledo, Ohio (Royal R. Irwin, of Denver, Colo., and Frank L. Mulholland, Clarence M. Mulholland, and Mulholland, Robie & McEwen, all of Toledo, Ohio, on the brief), for appellees Railway Labor Executive's Ass'n and Brotherhood of Railroad Trainmen.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.
Number 2456—Utah Copper Company et al. v. Railroad Retirement Board et al.

The questions presented in this appeal are whether certain employees of the Utah Copper Company, herein called the Copper Company, were employees since May 28, 1920, within the meaning of the Railroad Retirement Acts of 1935 and 1937, 49 Stat. 967, and 50 Stat. 307, 45 U. S.C.A. §§ 215–228 note and §§ 228a–228r, and therefore subject to the provisions of the act. A somewhat detailed statement of the pertinent facts is necessary to a consideration of the problems presented.

The Utah Copper Company of New Jersey, organized in 1904, owned and operated a large open pit copper mine in Bingham Canyon, in Salt Lake County, Utah. The ore was of low grade and required treatment by milling concentration, and smelting operations to make the operation of the mine profitable. A concentration mill was erected for this purpose at Magna, Utah, about twenty miles

away. The Copper Company determined to construct its own railroad to transport the ore from the mine to Magna. For this purpose, the Bingham and Garfield Railway, herein called the Railway Company, was incorporated under the laws of Utah as a common carrier. Its entire capital stock was owned by the Copper Company. Approximately eighty per cent of all of its business consisted of transportation of ore of the Copper Company to and from the smelter. All of its business, whether for the public generally or for the Copper Company, was done under regular, published tariff schedules. This course of business continued until 1920. At that time, in order to enable the Railway Company to avoid paying any part of its net income to the federal government under the recapture provision of Section 15a of the Interstate Commerce Act as added by section 422 of the Transportation Act of that year, 49 U.S.C.A. § 15a, a new arrangement was entered into by the Railway Company and the Copper Company. By this arrangement, the Railway Company transferred title to the equipment and motive power used in connection with the ore transportation, to the Copper Company. The agreement gave the Copper Company the right to transport its ore over the lines of the railway. It was provided that this right was to be exercised in common with the Railway Company and with others to whom a similar license might be granted.

The agreement provided that the Copper Company had the right to transport its ore from its mine to the smelter over the tracks and line of the Railway Company in its own cars and with its own equipment; that it had the right to select and should select and employ all engine and train crews to man and operate the trains and equipment. It provided that all engine and train crews operating the engines, cars, and equipment of the Copper Company should be the sole employees of the Copper Company and compensated solely by it; that all rights granted the Copper Company should be in subrogation to the rights and duties of the Railway Company as a common carrier; that the Railway Company should be the sole judge as to whether the operations of the Copper Company were in derogation of its duty as a common carrier; that in order to prevent curtailment of the Railway Company's duties as a common carrier, the movement of the ore trains and the use and enjoyment of such trackage rights were to be subject to the general supervision and direction of the Railway Company; and that all ore trains and car movements over the lines of the Railway Company should be dispatched and carried out under the direction of the Railway Company. The employees of the Railway Company who were operating the transportation equipment that was transferred to the Copper Company were transferred from the payroll of the railway to that of the Copper Company and were thereafter paid by the Copper Company.

At the time of the commencement of operations by the Railway Company, the Copper Company owned and operated several fully equipped shops in which all mechanical work required by the Railway Company was done. In 1913, the Railway Company erected its own shops at Magna, and from then until 1920 all its repair work, except heavy machine work, was done by its own employees in its own shops. When the trackage agreement was executed, these shops, together with other property, were transferred for a stated consideration to the Copper Company. At the time of the transfer, the employees in the shops were transferred from the payroll of the Railway Company to that of the Copper Company. Since then, repairs to the Railway Company's equipment, as well as to the equipment of other transportation companies, have been made at these shops at the request of the Railway Company. Since March 16, 1935, no officer or supervisor of the Railway Company has had any authority or supervision over the employees in these shops.

The Copper Company and the Railway Company instituted this action against the Railroad Retirement Board in the District Court of the United States for the District of Colorado, seeking to set aside the order of the Board determining that these employees were entitled to the annuity benefits of the Railroad Retirement Act as amended, 49 Stat. 967, 50 Stat. 307, 45 U.S.C.A. §§ 228a to 228r. The Railway Labor Executive Association and Brotherhood of Railroad Trainmen were permitted to intervene. Judgment was entered, denying the relief sought.

The first question presented is whether the scope of the inquiry of the reviewing court was limited to ascertaining whether the findings of the Board were supported by substantial evidence, or whether its action was arbitrary or capricious.

■ The scope and effect of decisions by administrative boards and commissions and their place in our judicial system have been considered and discussed in many cases. From these decisions has been evolved the doctrine of administrative finality—that is to say, that as to those matters entrusted to a board or commission its determinations are final and conclusive if founded on substantial evidence, and if made free from arbitrary or capricious conduct, and that the jurisdiction of the reviewing court is limited to questions affecting constitutional power, statutory authority, and compliance with basic concepts of proof under our system of jurisprudence. See Shields v. Utah Idaho Central Railroad Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

As to the effect of a finding by a board or commission, Chief Justice Hughes, in Shields v. Utah Idaho Central Railroad Co., supra, [305 U.S. 177, 59 S.Ct. 163, 83 L.Ed. 111], said: "The Commission is not only authorized but 'directed' to give the hearing and make the determination when requested. We cannot think that a determination so prescribed and safeguarded was intended to have no legal effect."

As to the scope of judicial review of proceedings by boards and commissions, the Chief Justice said: "The sole remaining question would be whether the Commission in arriving at its determination departed from the applicable rules of law and whether its finding had a basis in substantial evidence or was arbitrary and capricious."

In Railroad Commission v. Rowan & Nichols Oil Co., 311 U.S. 570, 576, 61 S.Ct. 343, 346, 85 L.Ed. 358, Justice Frankfurter said: " * * * it is clear that the Due Process Clause does not require the feel of the expert to be supplanted by an independent view of judges on the conflicting testimony and prophesies and impressions of expert witnesses."

■ We conclude that as to all matters confided to the Railroad Retirement Board for administration, its judgments are final and conclusive if supported by substantial evidence and if free from arbitrary or capricious conduct. To hold otherwise would, in effect, be making of the Board a mere master to take the testimony and make recommendations of proposed findings of fact and conclusions of law.

■■ But the question here is one of jurisdiction—that is, are these employees within the provisions of the act and therefore subject to the jurisdiction of the Board? This is a mixed question of fact and law. In United States v. Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070, a railroad sought authority from the Interstate Commerce Commission to abandon nine miles of track. The Interstate Commerce Commission Act, § 1(22) 49 U.S.C.A. § 1(22), excluded spur tracks from the operation of the act. The Commission found that the track in question was not a spur track. The Supreme Court held that this finding, although based on substantial evidence, was not final, but was subject to judicial review. In Shields v. Utah Idaho Railroad Co., supra, the question was whether a certain electric railroad was an interurban and therefore excluded from the provisions of the Railroad Labor Act, 45 U.S.C.A. § 151 et seq. The Interstate Commerce Commission held that it was. The question on appeal was whether this jurisdictional question was subject to review. The court held that a determination by the Interstate Commerce Commission upon hearing that an electric line was not an interurban was final and conclusive if based on substantial evidence and if the proceeding was free from arbitrary or capricious conduct. The court recognized the effect of United States v. Idaho, supra, but distinguished it on the ground that there the act did not confer power on the Board to decide the jurisdictional question, while under the Railroad Labor Act such authority was expressly conferred upon the Commission. The decisions of the Supreme Court therefore are to the effect that where the act creating a Board expressly provides that it shall upon hearing determine the question of jurisdiction, such determination, when supported by substantial evidence, is final and conclusive and not subject to review by an appellate court; but that if the act does not confer such power upon the Board or Commission, then the question is subject to independent review by the appellate tribunal.

■ The Railroad Retirement Act is silent on the power of the Board to pass upon the question of jurisdiction. The question is of course present in all proceedings before the Board and must of necessity be decided before the Board can proceed. But in the absence of a specific provision in the act, expressly lodging the

decision of the jurisdictional question in the Board, its decision, even if supported by competent evidence, is not final and may be independently examined by a court of review. The court was therefore in error in dismissing the proceedings on the ground that the decision of the Board in this respect was final because supported by competent evidence. ·

■ But the decision of the court, if right, will not be reversed because an erroneous reason was assigned therefor. City of Vero Beach v. Rittenoure Inv. Co., 10 Cir., 113 F.2d 269; Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224; Riley Investment Co. v. Commissioner, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36.

We therefore examine to see whether the employees in question are covered by the provisions of the act. Subsections (a), (b), (c), and (h) of Section 1, 45 U.S.C.A. § 228a, define with particularity the terms necessary to a consideration of the jurisdictional question. They are as follows:

"(a) The term 'employer' means any carrier (as defined in subsection (m) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the property or operating all or any part of the business of any such employer. * * *

"(b) The term 'employee' means (1) any individual in the service of one or more employers for compensation. * * *

"(c) An individual is in the service of an employer whether his service is rendered within or without the United States if he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, which service he renders for compensation. * * *

"(h) The term 'compensation' means any form of money remuneration earned by an individual for services rendered as an employee to one or more employers * * *."

■ Until 1920, all of the ore of the Copper Company was transported by the Railway Company in its own equipment, manned by its own employees. As stated, at that time, for the purpose of avoiding the effects of the recapture clause of the Revenue Act of that year, this equipment was transferred to the Copper Company. The license agreement did not affect the status of the Railway Company as a common carrier. It remained, and still is, such. The employees of the Railway Company operating the equipment were transferred to the payroll of the Copper Company. While the lease agreement provided that the Copper Company should select the crews to operate the equipment and that such crews should be the employees of the Copper Company, this was in effect not done. Aside from the transfer of the employees from the Railway Company's payroll to that of the Copper Company, there was no substantial change in the status of these employees. They remained under the supervision and control of the Railway Company, the same as its own employees. They were disciplined by the Railway Company and discharged by it. All employing of men in train service, whether they worked for the Copper Company or for the Railway Company, was done in the office of the Railway Company. The payrolls for the employees in question were made out by the Railway Company and then delivered to the Copper Company where the checks were then written. The checks when written were sent to the Railway Company offices where the employees received them. All the operations were substantially the same after as before the change. They were all under the supervision and control of the Railway Company. The record amply sustains the finding of the Board that these employees were under the continuing authority of an employer within the meaning of Subsection (c) and were individual employees within the meaning of Subsection (b) of Section 1 of the Act.

■ The second group of workers involved consists of those employed in the shops at Magna. Admittedly they are employees of the Copper Company and have no connection with the Railway Company. They are engaged in work connected with transportation of passengers and property by a railroad. As far as pertinent here,

Section 1(a) in substance defines an "employer" as any company under common control with a carrier. The Copper Company is the wholly owned and controlled subsidiary of Kennecott Copper Company. It owns no property in the state of Utah. It formerly owned all the outstanding capital stock of the Railway Company. This stock was transferred, together with its other assets, to Kennecott, so that now both the Copper Company and the Railway Company are wholly owned subsidiaries of Kennecott. The evidence also clearly establishes that both are under the common control and management of Kennecott. The Copper Company and the Railway Company each have seven directors. Kennecott has seventeen. Of these seventeen directors, three are also directors of the Copper Company, and the same three and one other are directors of the Railway Company. The president of Kennecott is chairman of the Board of Directors of both the Copper and the Railway Company. A director of Kennecott is president of both companies, and the vice president and treasurer of the Copper Company holds the same offices with the Railway Company. The common directorates and officers, as well as the ownership of the stock of the two companies by Kennecott, brands the Copper Company as an employer within the definition of Section 1(a) as to these employees, and brings them within the provisions of the Act.

One other point needs consideration. It is argued that since the Copper Company, which pays these employees, is not a carrier, therefore they do not receive their compensation from an employer as required by the act. The Act of 1937 defines "compensation" as any form of money remuneration earned for services rendered to one or more employers. We have held that as to those employees who are engaged in or connected with transportation, the Copper Company is an employer within the meaning of the act, because of the common control exercised over it and the Railway Company by the common parent, Kennecott. The employees, therefore, are rendering service to an employer for compensation within the meaning of the act.

*Number 2457*—Nevada Consolidated
    Copper Corporation et al. v. Railroad Retirement Board et al.

This appeal does not involve shop employees. With this one exception, the substantive facts and questions of law are identical with those in Number 2456, Utah Copper Company et al. v. Railroad Retirement Board et al. The transactions between the Nevada Consolidated Copper Corporation, the Nevada Northern Railway Company and Kennecott Copper Corporation, save as to time and place, parallel those between the Utah Copper Company, the Bingham and Garfield Railway Company and Kennecott Copper Corporation, and this decision is controlled by our opinion in the former case. No useful purpose would be served by narrating in detail the facts in this case, and in the interest of brevity they will be omitted.

The decision of the lower court in both Number 2456, Utah Copper Company et al. v. Railroad Retirement Board et al., and Number 2457, Nevada Consolidated Copper Corporation et al. v. Railroad Retirement Board et al., is affirmed.