## DUQUESNE WAREHOUSE CO. v. RAILROAD RETIREMENT BOARD.

District Court, S. D. New York.

Feb. 29, 1944.

Burlingham, Veeder Clark & Hupper, of New York City (George R. Allen, of Philadelphia, Pa., and Ray Rood Allen and Herbert Mayhew Lord, both of New York City, of counsel), for plaintiff.

Joseph H. Freehill, of Chicago, Ill., for defendant.

Samuel J. Cohen, of New York City, and Frank L. Mulholland, Clarence M. Mulholland, and Willard H. McEwen, all of Toledo, Ohio, for Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.

GODDARD, District Judge.

The plaintiff and defendant have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The suit is brought by the plaintiff pursuant to Section 11 of the Railroad Retirement Act, 45 U.S.C.A. § 228k, for a review of the Administrative Board's determination that the Duquesne Warehouse Company [hereinafter referred to as Duquesne] is an "employer" within Section 1(a)* of the

---

\* "Section 1. For the purposes of this Act—

"(a) The term 'employer' means any carrier (as defined in subsection (m) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which

Railroad Retirement Act of 1935 and 1937 [hereinafter referred to as the Retirement Act, 45 U.S.C.A. § 228a(a)], therefore subject to the provisions of the Act and consequently service rendered to Duquesne from the time of its incorporation on August 1, 1906 to date is creditable toward annuities under the Act. By consent the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, and George A. Harrison, President of said Brotherhood, have become intervening defendants.

The plaintiff, Duquesne Warehouse Company, was incorporated under the laws of the Commonwealth of Pennsylvania on August 1, 1906, and chartered for the purposes of conducting a storage and warehouse business. Since that time it has conducted a commercial warehouse business at Pittsburgh, Pennsylvania, in two places—one at East Liberty, and the other in Pittsburgh proper. From August, 1937, to May, 1938, it conducted a warehouse business at Erie, Pennsylvania, but solely with respect to news-paper print.

Duquesne's entire stock is owned by Pennsylvania Railroad Company and the officers of Duquesne are also officers of Pennsylvania.

Both warehouses are owned by Pennsylvania Railroad Company and operated by the plaintiff under a lease from Pennsylvania. There are direct railroad siding connections at both East Liberty and Pittsburgh proper; and in the buildings, both at East Liberty and Pittsburgh proper, the Railroad Company maintains its own freight agencies with its separate freight agents for the receipt and delivery of carload freight and less than carload lots. Duquesne issues warehouse receipts and is subject to the Pennsylvania Warehouse Receipts Acts. At the East Liberty warehouse the only commodity handled is sugar; this is an account of the California and Hawaiian Sugar Refining Corporation. The sugar is partly refined in California and partly in New York. That refined in California comes east by ship to one of the eastern ports and then moves by rail to Pittsburgh, which is used as a distributing point. That refined at New York moves by rail to Pittsburgh and from there is subsequently distributed. All sugar, either coming in or going out, is in carload lots.

At the other building in Pittsburgh proper a substantial warehouse business is conducted. The business comes into the warehouse chiefly by rail, approximately ninety five per cent. The other is trucked in but not locally. Coming by rail it arrives either in carload lots or less.

In the handling of the sugar and other freight received by the Warehouse for storage, it renders such services as the owner requests; it assorts and repacks the sugar in bags and cartons for distribution to the owners' customers. On outbound shipments the Warehouse receives from the Railroad bills of lading and on inbound shipments it issues warehouse receipts to the owners of the goods, and renders various services at their request for which the owner pays the Warehouse.

The employees of the Warehouse Company and the employees of the Railroad Company are entirely segregated. Employees of the Warehouse Company are on the payroll of that company and are paid by that company; they have never been employees of the Railroad Company; they are not accorded the pass privilege; they are not entitled to become members of the Pennsylvania Voluntary Relief Department, nor may they be members of the Pennsylvania Railroad Provident and Loan Association. Membership in the Voluntary Relief Department is limited to employees or former employees of the railroad; that in the Provident and Loan Association—to employees of the Railroad. The employees of the Warehouse Company are members of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, and with which Brotherhood the Warehouse Company has a working agreement. The goods, when in the warehouse, are under the sole supervision and control of Duquesne, or the owners of the goods.

Under a separate contract the Railroad delivers to the Warehouse Company freight which is damaged or refused. In making such delivery to the Warehouse Company the Railroad Company entirely severs its connection with the transporta-

operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passenger or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad. * * * "

tion of the property. The Warehouse Company reconditions such damaged or refused freight and sells it at private sale. For its services it charges ten percent of the gross proceeds of the sale, with deductions for any necessary expense, such as reconditioning, and remits the balance to the Railroad Company.

Duquesne sublets a portion of its space to the public for its own account. The greater portion of Duquesne's income is derived from sources other than the railroad contracts. Duquesne did, and does now, maintain a working agreement with Pennsylvania covering storage in transit privileges. Duquesne was recognized as a member of the Warehouse Industry under the N. R. A. Code. It was also recognized and paid accordingly as a member of the General Social Security Plan and not as a member of the Special Railroad Security System. Duquesne also paid according to State Unemployment Compensation Law. The properties of the Warehouse Company were never classified as carrier properties in the valuation of properties of the Pennsylvania Railroad Company by the Interstate Commerce Commission.

The Railroad Retirement Board [hereinafter referred to as the Board] consists of three members. The determination was made by the majority of the Board, but the third member, Mr. Reed reached a contrary conclusion and dissented. The majority and the dissenting member made findings of fact and conclusions of law.

The first question to be decided is the scope of the review by this court. Are the findings, as made by the Board, conclusive upon the court if they are based on substantial evidence, and are not arbitrary or capricious?

In all matters delegated to the Board for determination and administration its judgments are final if supported by substantial evidence and free from arbitrary or capricious conduct, as they obviously must be if they are to serve the purpose for which the Board was created. Utah Copper Co. v. Railroad Retirement Board, 10 Cir., 129 F.2d 358, certiorari denied 317 U.S. 687, 63 S.Ct. 258, 87 L.Ed. 551.

But a preliminary question arises and that is one of jurisdiction: Is the plaintiff an "employer" as defined by the Retirement Act and subject to the jurisdiction of the Board?

In Utah Copper Co. v. Railroad Retirement Board, supra, it was held that in the absence of a specific provision in the Act creating the Board, expressly lodging the decision of the jurisdictional question in the Board, its decision, even if supported by competent evidence, is not final and may be independently examined by a court of review, and that as the Railroad Retirement Act is silent on the power of the Board to pass upon the question of jurisdiction, its decision as to jurisdiction is subject to review. Cf. Shields et al. v. Utah Idaho Central Railroad Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111; United States et al. v. Idaho et al., 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; Wichita R. & Light et al. v. Public Utilities Comm. et al., 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Ellers v. Railroad Retirement Board, 2 Cir., 132 F.2d 636.

If the findings of fact which form the basis for the determination that Duquesne is an "employer" within Section 1(a) of the Retirement Act are supported by substantial evidence, it is clear from reading the Act and the Regulations promulgated under the Act that the Board has jurisdiction. Are these findings of fact supported by substantial evidence? It does not seem to me that the record substantiates the finding that Duquesne's operations are, and have been directly, both functionally and economically, related to Pennsylvania's transportation of property by railroad. I think the record rather warrants the findings made in the dissenting decision, which are to the effect that Duquesne has always represented itself as a separate distinct corporate entity, and has conducted its business as such separate corporate entity; nor does the record substantiate the findings that Duquesne is, and has been engaged in the non-casual operation of equipment and facilities, and the performance of non-casual service in connection with Pennsylvania's transportation of property by railroad. The record shows that Duquesne was engaged in these operations for its own corporate benefit.

Included in the essential findings of fact made by the Board are the following, the

italicized parts of which are objected to by the plaintiff:

"3. *Duquesne's operations are now and have been at least since August 28, 1935, intimately and integrally related to Pennsylvania's railroad transportation.* Duquesne has been primarily, principally and predominantly engaged in the storage, loading and unloading, and other handling of goods transported over the lines of Pennsylvania, *being in substance an agency of Pennsylvania for such purposes.*"

This finding is based on the evidence found in the record. [Pages 56-60, 83-86, 87-94, 105, 106, 130-135, 165, 166, 175-178].

▆▆ .The Board bases its conclusion that Duquesne was an "employer" within the meaning of Section 1(a) largely upon the information obtained in its first questionnaire [R. 56-60]. Plaintiff urges that the questions in the questionnaire were ambiguous and the answers necessarily were vague and misleading, and this seems to be true particularly . of question ."6a". Plaintiff does state that it conducts operations in connection with Pennsylvania and in truth it does, but not in the manner indicated in the finding. The Board also based its finding on the Salvage Freight Contract of 1922 [R. 83-86] between Duquesne and Pennsylvania Railroad, but this evidence, if it substantiates any conclusion, supports the conclusion that Duquesne's acts were separate and segregated corporate operations. The Board also relies upon the agreement between Duquesne and the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees [R. 87-94]. This might be significant ' were. it not the fact that the evidence [R. 46, 107, 134] shows that Duquesne's employees are on the payroll of Duquesne and are under the sole supervision of Duquesne's superintendent; are not permitted free transportation on the Pennsylvania lines; are not entitled to become members of the Pennsylvania Railroad Voluntary Relief Department, or the Pennsylvania Employees Provident and Loan Association. These latter facts outweigh any inference to be drawn from the Brotherhood agreement. The Board further based its finding on the memorandum submitted by Duquesne in support of its position [R. 130-135] in which there is a recital of Duquesne's operations. But this does not show Duquesne's operations to be interwoven with Pennsylvania's. It rather tends to establish that Duquesne and Pennsylvania have always held themselves out as separate and distinct corporate entities and have conducted their affairs in that manner.

The facts which lead to this later conclusion are many, but to mention a few referred to in that memorandum: There is the establishment of Pennsylvania's, segregated freight agencies; Duquesne's and Pennsylvania's adherence to the loading and unloading requirements; the interchange of bills of lading and warehouse receipts; the fact that Duquesne or the owners have the sole control of the goods while the goods are in storage; and Duquesne's individual practice of subletting space to customers. Another element upon which the Board based its finding is two bills of lading [R. 165, 166]. But the mere fact that a warehouse company affords storage in transit privileges does not lead to the conclusion that such warehouse is "intimately and integrally" related to the carrier, nor does the existence of ' the present Salvage Contract [R. 175-178] between Duquesne and Pennsylvania support such a finding. It shows a contractual relation.

In my opinion this finding No. 3 is not supported by substantial evidence.

"4. *The two warehouses operated by Duquesne—one in Pittsburgh proper and the other at East Liberty in Pittsburgh—have been valuable links in the chain of Pennsylvania's railroad transportation.* They are owned by Pennsylvania and are operated by Duquesne under lease from Pennsylvania. A portion of the ground floor of each warehouse is retained by Pennsylvania and used and officially designated by it as its 'freight agency'. Duquesne's warehouses, as well as. Pennsylvania's 'freight agencies', are served by Pennsylvania's railroad tracks, and are equipped with platforms or sidings and other facilities for the receipt, delivery, and other handling of inbound and outbound freight."

The only evidence in the record to support this finding consists of the two bills of lading [R. 155, 156] and the "Transit in storage Rules" [R. 167]. There is no substantial evidence to justify this finding, which seems quite speculative.

"7. *Duquesne also performed, during the period between August 1937 and May*

*1938 unloading, storing, and relading services and other transit details at Erie, Pennsylvania, in connection with carload shipments of news-paper print entitled to storage-in-transit privileges under Pennsylvania's tariffs. These services were similar to those performed by Duquesne at East Liberty."*

The plaintiff objects to the linking of "other transit details" with "in connection with". The objection is without merit.

*"8. Duquesne's position as an agency of Pennsylvania, available to provide such facilities and services as the latter requires, appears further from* Duquesne's handling, reconditioning, and selling for Pennsylvania, overfreight, damaged refused freight, and damaged unclaimed freight under a contract originally entered into between the two companies on February 1, 1922, and superseded by a contract dated January 2, 1941. Pennsylvania transports to Pittsburgh any freight it desires to be disposed of by Duquesne and Duquesne removes such freight to its warehouse after the payment to Pennsylvania of all freight and other charges that may have accrued thereon. Out of the gross proceeds realized by it from each sale, Duquesne deducts a commission of 10 percent and any amounts paid by it for reconditioning, drayage, freight, and other charges, and turns the balance over to Pennsylvania. In the event that the gross proceeds of the sale of freight do not equal the expenses incurred by Duquesne, plus the 10 percent commission, Duquesne is credited with the difference. When any freight is returned by Duquesne to Pennsylvania upon the latter's order, Duquesne is reimbursed only for the actual expenses incurred by it plus storage charges. Under the original contract, if any lot of freight became so worthless as to be unsalable, Duquesne was required to dispose of it as directed by Pennsylvania. Under the new contract, Duquesne is given authority to dispose of such goods as it sees fit. The original contract also provided that if the owner of any unclaimed freight is ascertained prior to the sale of such freight, Duquesne was to deliver such freight, upon instructions from Pennsylvania, to the owner, and was to receive from the owner such charges as Duquesne has paid to Pennsylvania. The new contract provides that under such circumstances Duquesne shall, upon Pennsylvania's request, return such freight to Pennsylvania upon repayment of all charges thereon which Duquesne shall have paid to Pennsylvania."

Such a comprehensive finding that Duquesne is an "agency of Pennsylvania" and is "available to provide such facilities and services as the latter requires" is not warranted. The facts merely show the existence of a contractual agency for specifically agreed and limited purposes. The figures show that some 40 per cent for 1936, 26 per cent for 1937, 30 per cent for 1938 of Duquesne's income was derived from various working agreements with Pennsylvania; they do show the "substantial extent" of Duquesne's source of income and that the income is "connected with" in a certain degree, to the transportation of goods by the Pennsylvania Railroad. However, the greater portion of Duquesne's income is derived from sources other than the Pennsylvania Railroad. Since the phrase "in connection with", as used in the Act, is limited to a specific meaning, the wording of this finding may well lead to a misconception of the true relationship of Duquesne's entire income to that portion derived from the business received from Pennsylvania Railroad Company, and I think plaintiff's objection is merited.

*"13. Duquesne's operations are, and have been at least since August 28, 1935 directly related, functionally and economically, to the performance of the transportation obligations which Pennsylvania has undertaken as a common carrier by railroad, and to the receipt, delivery, transfer in transit, storage, and handling of property transported by Pennsylvania railroad."*

The effect of this finding is to make Duquesne a department in the Pennsylvania transportation system which is not warranted by the evidence in the record. Duquesne has always conducted itself as a separate distinct corporate entity. Duquesne's employees perform services solely for Duquesne and there is no interweaving of the services of the employees of Duquesne and those of Pennsylvania; they are on entirely different payrolls. Duquesne's employees are and have been recognized solely as employees of a warehouse and hence have never been granted the privileges that Pennsylvania's employees may have had. Duquesne was recognized as a member of the Warehouse Industry under the N. R. A. Code. Duquesne was recognized and paid accordingly, as a member of the General Social Security Plan and not as a member of the

92

Special Railroad Security System. It is true that Duquesne had working agreements with Pennsylvania and as a result realized a profitable income. In this way Duquesne's operations, in a limited degree, are directly related, functionally and economically, to Pennsylvania's transportation obligations. Such relationship, however, is only a result of contractual agreements, and not because of any functional and economical interweaving by Duquesne and Pennsylvania. The conclusion in this finding is not supported by the evidence.

"14. *Duquesne is, and has been at least since August 28, 1935, engaged in the non-casual operation of equipment and facilities and the performance of non-casual service in connection with Pennsylvania's transportation of property by railroad, other than trucking service, and the receipt, delivery, transfer in transit, storage, and handling of property transported by Pennsylvania by railroad.*"

From an analysis of the previous findings, it appears that there is no substantial evidence to support this finding.

 The language of the Carriers Taxing Act of 1937, 45 U.S.C.A. § 261 et seq., in defining "employer" is identical with the language in the definition of "employer" in the Railroad Retirement Act, and it has been held to be a companion statute of the Railroad Retirement Act. Railroad Retirement Board v. Alton, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468; State of California v. Anglim, 9 Cir., 129 F.2d 455; Allen v. Ocean S. S. Co. of Savannah, 5 Cir., 123 F.2d 469. It has also been held that the administrator of the Carriers Taxing Act is without jurisdiction unless it be found that the company is an express company, sleeping car company, or carrier by railroad subject to Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.—no contention is made that Duquesne is any of these; or that it is a "company which is directly or indirectly owned or controlled by one or more of such carriers [subject to Part I of the Interstate Commerce Act] or under common control therewith, *and* which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad * * *." The requirements of the alternative conditions, namely, control *and* operation in connection with the transportation of persons or property by railroad, are conjunctive and unless the company

falls within both requirements, the administrative agency lacks jurisdiction. Walling v. Baltimore Steam Packet Co., D.C., 50 F.Supp. 639, 642. Cf. Crowell v. Benson, 285 U.S. 22; Wichita R. & Light Co. et al. v. Public Utilities Comm. et al., 260 U.S. 58, 43 S.Ct. 51, 67 L.Ed. 124; Louisville & Nashville R. Co. v. Finn et al., 235 U.S. 601, 35 S.Ct. 146, 59 L.Ed. 379. It is conceded that Duquesne fulfills the requirement of control. However, since the finding that Duquesne "operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad" is not supported by the substantial evidence, Duquesne does not come within the requirements of an "employer" as defined by Section 1(a) of the Retirement Act; therefore it necessarily follows that the Retirement Board is without jurisdiction for one of the jurisdictional requirements of the Act is lacking.

Accordingly the plaintiff's motion for summary judgment is granted, and the motion of the defendant is denied.

Settle order on notice.