## RAILROAD RETIREMENT BOARD et al. *v.* DUQUESNE WAREHOUSE CO.

NO. 95.

Argued November 14, 1945.—Decided January 2, 1946.

*Mr. Robert L. Stern*, with whom *Solicitor General McGrath, Messrs. David L. Kreeger, Myles F. Gibbons* and *David B. Schreiber* were on the brief, for the Railroad Retirement Board. *Mr. Willard H. McEwen*, with whom *Messrs. Frank L. Mulholland* and *Clarence M. Mulholland* were on the brief, for the Brotherhood of Railway & Steamship Clerks, etc. et al., petitioners in No. 95 and respondents in No. 103.

*Mr. John Dickinson*, with whom *Messrs. George R. Allen, John Spalding Flannery* and *R. Aubrey Bogley* were on the brief, for the Duquesne Warehouse Company.

*Messrs. John J. Hickey* and *Walter W. Ahrens* filed a brief on behalf of the American Warehousemen's Association, as *amicus curiae*, urging affirmance in No. 95 and reversal in No. 103.

Mr. Justice Douglas delivered the opinion of the Court.

The Railroad Retirement Act of 1937, 50 Stat. 307, 45 U. S. C. § 228a, established a system of annuity, pension, and death benefits for employees of designated classes of employers. The Railroad Retirement Board adjudicates claims of eligible employees for the various types of benefits created by the Act. § 10 (b). The eligibility of an employee for such benefits is based on service to those included in the Act's definition of "employer." § 1 (a).

The question arose whether the Duquesne Warehouse Co. was such an "employer." The Board after a hearing found in No. 95 that it was. Duquesne, pursuant to the provisions of § 11 of the Act, brought suit in a district court to compel the Board to set aside its order.[1] That court rendered judgment for Duquesne. 56 F. Supp. 87. The Circuit Court of Appeals affirmed, by a divided vote. 148 F. 2d 473.

The Railroad Unemployment Insurance Act of 1938, 52 Stat. 1094, 45 U. S. C. § 351, established a system of unemployment insurance for employees of designated classes of employers. The Railroad Retirement Board adjudicates claims of eligible employees for unemployment insurance payments. § 5 (b). The eligibility of an employee for such payments is based on service to those included in the Act's definition of "employer." § 1 (a). The question arose whether Duquesne was such an "employer." The Board after a hearing found in No. 103 that it was. The findings were identical to those which the Board made in No. 95 and were based on the same record. Duquesne, pursuant to § 5 (f), brought suit in the district court for the District of Columbia to set aside that order. That court gave judgment for Duquesne. The Court of Appeals for the District of Columbia reversed. 149 F. 2d 507. Since the definition of "employer" under both Acts was the same, there was presented a conflict in decisions which led us to grant the petitions for writs of certiorari.

The material part of the definition of "employer" contained in each Act is as follows:

"The term 'employer' means any carrier . . . and any company which is directly or indirectly owned or controlled by one or more such carriers or under common con-

---

[1] The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees and its president, G. M. Harrison, were allowed to intervene as defendants in No. 95. The Brotherhood intervened in No. 103.

trol therewith, and which operates any equipment or facility or performs any service . . . in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad . . ."

Duquesne meets the requirements of the first part of the definition. For it is a corporation, all of whose stock is owned by the Pennsylvania Railroad Company, a carrier by railroad. The question is whether Duquesne "performs any service" (1) "in connection with the transportation of . . . property by railroad" or (2) "in connection with . . . the receipt, delivery . . . storage, or handling of property transported by railroad."

Duquesne operates two warehouses owned and leased to it by the Pennsylvania, one in Pittsburgh and the other in East Liberty, within the Pittsburgh city limits. Each warehouse is on a rail siding of the Pennsylvania. At East Liberty, Duquesne handles and stores carload sugar, all of which comes in and goes out over the Pennsylvania. The sugar is handled by Duquesne under so-called storage-in-transit privileges covered by tariffs filed by the Pennsylvania with the Interstate Commerce Commission.[2] Duquesne unloads the sugar from the Pennsylvania's cars on arrival and reloads the sugar into Pennsylvania's cars on their departure. By the tariff the owners are required to do the loading and unloading. The work of unloading and loading is performed for the owner by Duquesne, who

---

[2] Incoming shipments are consigned to the owner care of Duquesne, the route being designated "Penn R R — For Stge in Transit." Outgoing shipments are consigned to the owner; they have a transit record number and are marked "accorded transit privilege at East Liberty, Pa." That is, sugar in carload lots transported by the Pennsylvania to consignees at East Liberty may be delivered there to the consignees at the local rates. When it is subsequently shipped out via the same road it is entitled to be charged the through rate from the first point of shipment to the ultimate destination.

bills the owner for that service as well as for storage and other services rendered. At its Pittsburgh warehouse Duquesne handles freight which has come in, or is destined to movement, over the Pennsylvania, or which has both come in and is going out over the Pennsylvania. The commodities handled at that place are hauled in both carload and less-than-carload lots. Duquesne loads and unloads the carload shipments as they arrive at and depart from its platform, stores the goods, and performs other handling services in connection with their receipt and delivery. Duquesne charges the owner for these services. In the case of incoming less-than-carload shipments the freight is unloaded by the Pennsylvania from the cars to its platform and is delivered to and received by Duquesne there. In the case of outgoing less-than-carload shipments, Duquesne delivers the freight on the Pennsylvania's platform. Pennsylvania then issues its bill of lading, loads the freight into cars, and moves them out. During a part of the period relevant here,[3] Duquesne also performed unloading, storing and reloading services and certain other transit services at Erie, Pennsylvania, in connection with carload shipments of newsprint paper which were entitled to storage-in-transit privileges under the tariffs. These services were similar to those performed by Duquesne at East Liberty.[4]

Of the total space used by Duquesne at its warehouses at East Liberty and Pittsburgh, about 30 per cent was devoted to the handling of freight accorded storage-in-

[3] Between August 1937 and May 1938. The Board found that Duquesne is now and has been at least since August 28, 1935, an employer within the meaning of the Acts.

[4] Duquesne also has "salvage freight" agreements with the Pennsylvania under which the Pennsylvania turns over to it, for sale or other disposition, "over" and damaged freight which has been refused or unclaimed by the owner. For this service Duquesne retains 10 per cent of the gross plus certain costs and remits the balance to the Pennsylvania.

transit privileges in 1936; about 12.5 per cent in 1937; about 12.5 per cent in 1938. During the period of operation at Erie, all the space at that point was used for such freight.

It appears that the definition of "employer" in the present Acts derives without substantial change from the Railway Labor Act, 48 Stat. 1185, 45 U. S. C. § 151, First.[5] We are referred to the legislative history of the Railway Labor Act which was sponsored by Mr. Eastman, Federal Co-ordinator of Transportation. Reliance is made on his testimony at the hearings[6] as indicating that the words in the carrier definition in the Railway Labor Act descriptive of transportation service were taken from the Interstate Commerce Act,[7] 41 Stat. 474, 54 Stat. 899, 49 U. S. C. § 1. The Railroad Retirement Act of 1937 was sponsored by both labor and management, whose views were presented at the hearings by George M. Harrison.[8] References are made to his testimony that the carrier affiliates embraced within the definition of "employer" are

---

[5] The corresponding part of the definition of "carrier" contained in § 1 First of the Railway Labor Act reads as follows: "any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad . . ."

[6] Hearings, S. Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., pp. 10–11, 145. At the latter point he testified, "I am inclined to believe that for the present it would be well not to go beyond carriers and their subsidiaries engaged in transportation." And see Hearings, H. Committee on Interstate and Foreign Commerce on H. R. 7650, 73d Cong., 2d Sess., pp. 17, 18.

[7] Sec. 1 (3) (a) of the Interstate Commerce Act includes in the definition of transportation "all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported."

[8] See Hearings, H. Committee on Interstate and Foreign Commerce, on H. R. 6956, 75th Cong., 1st Sess., pp. 10–11, 82.

those who are engaged in service that is part of railway transportation.[9] Duquesne argues on the basis of that legislative history that any service "in connection with the transportation" of property or any service "in connection with" the receipt, etc., of "property transported by railroad," as used in the present Acts, means that kind of activity which is defined by the Interstate Commerce Act as forming a part of transportation service. On the other hand, the Board argues that the statutory definition of "employer" is not so restricted. It stresses the broad sweep of the statutory language and the purpose to bring under the Act affiliates which carry out portions of the railroad's business.[10]

[9] See Hearings, *supra*, note 8, pp. 16, 17. He testified at the latter point that carrier affiliates were included "when those companies are engaged in the business of transporting passengers or property for the railroad, or other service that is a part of railway transportation." And see Hearings, S. Committee on Interstate Commerce on S. 2395, 75th Cong., 1st Sess., p. 11.

[10] Senator Wagner, who was in charge of the Retirement Bill in the Senate, stated: "the coverage is extended expressly to railroad labor organizations, railroad associations, traffic associations, and is made more clearly applicable to subsidiaries of railroad companies such as refrigerator storage and other facilities. In other words, it covers a greater number of employees, not only those directly in the railroad business but those associated with it, and in that regard it is more liberal than the present act." 81 Cong. Rec. 6223.

In S. Rep. No. 697, 75th Cong., 1st Sess., p. 7, it is stated, after noting that casual service and operation is excluded, "In addition to trucking service, it is intended to exclude employees of a contractor who may, for example, be occasionally employed by a 'carrier' to repair a depot or build a bridge. Contractors, other than those which perform casual service, would not be excluded, irrespective of whether control be legal or de facto. De-facto control may be exercised not only by direct ownership of stock, but by means of agreements, licenses, and other devices which insure that the operation of the company is conducted in the interests of the carrier.

"By these changes there are brought within the scope of the act substantially all those organizations which are intimately related to

We do not find it necessary to resolve that controversy. At the very least the phrases in question embrace activities which form a part of transportation service within the meaning of the Interstate Commerce Act. Duquesne regularly performs service of that character. It is, therefore, an "employer" within the meaning of the present Acts.

We have noted the loading and unloading services rendered by Duquesne. The duty of unloading carload freight ordinarily rests with the shipper or consignee. *Pennsylvania R. Co.* v. *Kittanning Co.,* 253 U. S. 319, 323. But it is a transportation service within the meaning of the Interstate Commerce Act. *Atchison, T. & S. F. R. Co.* v. *United States,* 295 U. S. 193, 200; *Barringer & Co.* v. *United States,* 319 U. S. 1, 6. Its cost may be included in the line-haul tariffs or separately fixed or allowed as an additional charge. *Adams* v. *Mills,* 286 U. S. 397, 410–415; *Loading and Unloading Carload Freight,* 101 I. C. C. 394; *Berg Industrial Alcohol Co.* v. *Reading Co.,* 142 I. C. C. 161, 163–164; *Livestock Loaded and Unloaded at Chicago,* 213 I. C. C. 330, 336–337. See *Haberman* v. *Pennsylvania R. Co.,* 234 I. C. C. 167, dealing with less-than-carload lots.

Duquesne's answer is that the service of loading and unloading is done by it for its customers, that these services are rendered before railroad transportation has begun

---

the transportation of passengers or property by railroad in the United States."

It is also pointed out that various railroad associations are included in the Acts and that their express inclusion was to make clear what had been previously implied. *Id.,* pp. 6–7. It is therefore argued that since some of those associations are not engaged in railroad transportation, Congress did not intend the coverage of the Acts to be restricted to organizations engaged in transportation either in the ordinary sense or in the sense in which the Interstate Commerce Act uses the term.

or after it has ended, that they are not and cannot be a part of railroad transportation since the tariff of the Pennsylvania forbids it from performing the services. Duquesne's conclusion is that under such circumstances loading and unloading are not and cannot be a part of railroad transportation. The question, however, is not whether in these cases the service of loading and unloading is being rendered by the Pennsylvania and is, therefore, in fact a part of its transportation service. It is not whether the affiliate would itself be subject to the Interstate Commerce Act. It is whether a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs. If it is such a service, it is a transportation service within the meaning of the present Acts. Senator Wagner, who was in charge of the Retirement Bill in the Senate, stated that its coverage included "not only those directly in the railroad business but those associated with it." [11] And George M. Harrison, on whose testimony Duquesne heavily relies, stated that affiliates of carriers were included "when those companies are engaged in the business of transporting passengers or property for the railroad, or other service that is a part of railway transportation." [12] In other words if a service is involved which the railroad could perform as a part of its transportation service, it is within the present Acts. It then makes no difference that it is performed by a carrier affiliate rather than by the carrier itself. We think it plain that the definitions in question include at the very least those activities which would be transportation services when performed by a railroad but which it chooses to have performed by its affiliate.

We do not decide whether services other than loading and unloading which are performed by Duquesne are in the same category nor whether the "employer" definitions

---

[11] See note 10, *supra.*
[12] See note 9, *supra.*

may be given a broader scope. It is sufficient for the disposition of these cases that the loading and unloading services performed by Duquesne are services performed "in connection with the transportation of . . . property by railroad."

The judgment in No. 95 is reversed. The judgment in No. 103 is affirmed.

*It is so ordered.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.