**STANDARD OFFICE BUILDING CORPORATION and Santa Fe Land Improvement Company, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**Nos. 86–2460, 86–2906.**

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1987.

Decided May 19, 1987.

Brian J. McKenna, Santa Fe Southern Pacific Corp., Chicago, Ill., for plaintiffs-appellants.

Nancy G. Morgan, Chief Appellate Sec., Tax Div., Dept. of Justice, David I. Pincus, Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

These consolidated appeals by two affiliates of the Atchison, Topeka and Santa Fe Railway—Standard Office Building Corporation and Santa Fe Land Improvement

Company—present two difficult questions: one under the Railroad Retirement Tax Act, 26 U.S.C. §§ 3201 *et seq.;* the other under the Internal Revenue Code's three-year statute of limitations on the assessment of past-due taxes, 26 U.S.C. § 6501(a).

The Railroad Retirement Tax Act, passed in 1937, is to the railroad industry what the Social Security Act is to other industries: the imposition of an employment or payroll tax on both the employer and the employee, with the proceeds used to pay pensions and other benefits. For background see Deford, *The Railroad Retirement Act: A Short Trip Down the Main Track,* 17 Clearinghouse Rev. 90 (1983). The Act requires the railroad to pay an excise tax equal to a specified percentage of its employees' wages, and also to withhold a specified percentage of its employees' wages as their share of the tax. The railroad retirement tax rates are much higher than the social security tax rates. For example, for this year the employer's social security tax is 7.15 percent of the first $43,800 of the employee's wages, see 26 U.S.C. §§ 3111(a), (b), while the corresponding figure under the Railroad Retirement Tax Act is at least 21.90 percent, see 26 U.S.C. §§ 3221(a)–(d). The employee's tax is also higher. Compare 26 U.S.C. §§ 3101(a), (b), with *id.,* §§ 3201(a)–(c), 3231(e)(2).

Economic theory suggests that most of the burden of a payroll tax is borne by the employees, in the form of lower wages or fewer employed, rather than by the employer—and this regardless of whether the tax is nominally on the employer or the employee. An employer willing to pay $20 an hour for a worker does not care whether he pays the worker the whole $20 or pays $18 to the worker and $2 to the government, but he will not pay the worker $20 if he must pay $2 to the government and the worker is worth only $20 to him. This is not to say, however, that the employer will be indifferent to the tax. Collective bargaining arrangements (compulsory in the railroad industry) may prevent him from reducing wages, at least immediately; and the reduction in the employee's after-tax wage (if the employer finds it feasible to make the reduction) may drive the best workers from the industry. These effects may be small, for a variety of reasons including the fact that a larger pension is a benefit to the worker, partially offsetting the fall in his after-tax wage. Nevertheless it is not surprising that Congress feared that some employers would try to avoid the tax; to prevent this the statute defines "employer" as either "any [rail] carrier" or

> any company which is directly or indirectly owned or controlled by one or more such carriers or *under common control therewith,* and which operates any equipment or facility or *performs any service* (except trucking service, casual service, and the casual operation of equipment or facilities) *in connection with the transportation of passengers or property by railroad,* or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad....

26 U.S.C. § 3231(a). The same definition appears in the statutes entitling railroad employees to pensions and unemployment benefits. See Railroad Retirement Act, 45 U.S.C. § 231(a)(1); Railroad Unemployment Insurance Act, 45 U.S.C. § 351(a). Those statutes are the expenditure side of the coin; the Railroad Retirement Tax Act is the revenue side.

We have italicized the portions of the statute that pertain to this case. Both Standard Office Building and Santa Fe Land Improvement are conceded to be under common ownership with the Atchison, Topeka and Santa Fe Railway, all being subsidiaries of Santa Fe Southern Pacific Corporation. Both deny, however, that they perform any service in connection with rail transportation. The district court rejected Standard Office Building's denial as a matter of law, by granting the government's motion for summary judgment. Santa Fe Land Improvement's denial has not been litigated yet, as we shall see.

■■ The question whether a particular constellation of activities adds up to "ser-

vice ... in connection with" rail transportation is the kind of "mixed" question of fact and law (really, the application of a legal standard to facts) that, in this circuit at least, is governed by the clearly-erroneous standard. See, e.g., *Mucha v. King*, 792 F.2d 602, 605 (7th Cir.1986), and cases cited there; *Wright v. United States*, 809 F.2d 425, 428 (7th Cir.1987). This is not the universal view. *Atlantic Land & Improvement Co. v. United States*, 790 F.2d 853, 855 (11th Cir.1986), for example, a case similar to the present case as we shall see, states that appellate review of mixed questions of fact and law is plenary. If the question whether Standard Office Building is a covered employer is, as we believe, subject to the clearly-erroneous standard, then our expected course should we disagree with the district judge's grant of summary judgment would be to remand for a trial of the issue. But the district court, the parties, and the courts in the other cases dealing with the question of a railroad affiliate's performing services in connection with railroad transportation all treat the question as a pure question of statutory interpretation. The Internal Revenue Service wants us to decide the question as one of law, and we shall do so, deeming the Service to have waived any right to a trial that it might otherwise have.

Standard Office Building Corporation was formed in 1902 to own and operate the Railway Exchange Building, which is on Michigan Avenue in downtown Chicago (and, by a coincidence, visible from the chambers of all three members of this panel). At first the Atchison, Topeka and Santa Fe Railway was a minority shareholder of the corporation and a minor tenant of the building, but over the years both its share ownership and its tenancy grew, and by 1980 its parent corporation, Santa Fe Southern Pacific Corporation, owned all of the stock of the corporation and the railroad was the lessee of 57 percent of the usable office space in the building. The railroad used most of this space itself, for the headquarters of various departments such as the engineering, freight and passenger traffic, and mechanical and transportation departments. What it did not use itself it sublet to tenants, some of which are affiliated with the railroad, others not. The record is unclear on both the activity of the affiliated subtenants and the percentage of space in the building actually occupied by the railroad during the relevant period; but it seems the percentage was between 42 and 57 percent. The building is managed by an independent contractor; however, the building's maintenance staff of 64, consisting mainly of janitors (49) but also of electricians, elevator operators, and others, is employed by Standard Office Building Corporation, although supervised by the building manager. These workers belong to unions, but not railway unions. Their unions have negotiated collective bargaining agreements with Standard Office Building under which the workers are to receive a pension, in addition to social security benefits, when they retire, but not a railroad pension.

Although aware of the relevant corporate relationships and the use made of the building by the railroad, the Internal Revenue Service until recently believed that Standard Office Building was liable for social security tax rather than railroad retirement tax on the wages of the building's maintenance staff. In 1973, after an audit, the IRS expressly determined that the company was not subject to the Railroad Retirement Tax Act. It changed its mind, however, and in 1981 and 1983 assessed past-due railroad retirement tax for the period 1972 through 1980 of (after various adjustments) some $500,000. Standard Office Building paid a portion of the assessment and then brought this suit for refund. On cross-motions for summary judgment the district judge held that the company was liable for the tax and rejected the company's argument that the assessment for the years before 1979 was barred by the Internal Revenue Code's three-year statute of limitations. 640 F.Supp. 549 (N.D.Ill.1986). The judge certified his order for an immediate appeal under 28 U.S.C. § 1292(b); we agreed to hear the appeal.

Santa Fe Land Improvement Company, created in 1900, is a real estate subsidiary of Santa Fe Southern Pacific Corporation and, like the railroad, a tenant of the Railway Exchange Building. It too had never paid railroad retirement tax on its employees' wages; in 1949 the Railroad Retirement Board had ruled that it was not subject to the Railroad Retirement Act and had advised the IRS of this ruling. It too was assessed railroad retirement tax in the early 1980s for the period 1972 through 1980, paid a portion of the assessment, and brought a suit for refund. The district judge denied Santa Fe Land Improvement's motion for partial summary judgment based on the statute of limitations and on a statute of forgiveness in the Revenue Act of 1978, and certified his order for an immediate appeal under section 1292(b); we agreed to hear the appeal and consolidated it with Standard Office Building's appeal. The record on appeal is silent on whether Santa Fe Land Improvement Company performs any service in connection with railroad transportation.

On whether Standard Office Building performs such service, the parties at argument took unreasonable positions. The company's position is that only the railroad's "operating employees" (idiosyncratically defined) and senior executives perform such service. Nonoperating employees, estimated by counsel to be one-third of the railroad's total employees, do not, with the exception as we have said of senior executives. So the employee who cleans the railroad cars performs a service in connection with rail transportation, but the employee who cleans the first employee's mops does not. This is the peculiarity in the company's definition of "operating employee." The Interstate Commerce Commission, in the periodic reports of railroad employment issued by its bureau of accounts, classifies railroad employees as follows: executives, officials and staff assistants; professional and administrative; maintenance of way and structures; maintenance of equipment and stores; transportation (other than train and engine); transportation (train and engine). 49 C.F.R. § 1245.5. The first two categories account for a shade less than one-fourth of total railroad employment, but Standard would classify some of the other employees, as well, as nonoperating employees.

According to Standard, although the president of the railroad performs a service in connection with rail transportation, his secretary, his assistants, even his junior executives—and certainly the staff that maintains his executive suite—do not. Of course, if the secretary is an employee of the railroad, her wages are subject to the Railroad Retirement Tax Act. Every *railroad* employee is subject to the Act; the proviso that the employer, to be covered by the Act, must perform a service in connection with rail transportation is applicable only to railroad affiliates, such as Standard Office Building Corporation. However, if the railroad spun off all its nonoperating functions to an affiliate which then became the employer of all of the railroad's nonoperating employees, the new subsidiary would under Standard's view escape liability for railroad retirement tax on their wages. Thus it could make no difference in the present case whether the railroad were the sole tenant of the Railway Exchange Building, or were one of many tenants and occupied only a small amount of space, since in Standard's view building maintenance workers are never providers of railroad services.

The government's counsel went to the opposite extreme by arguing that a railroad affiliate which performs *any* service for a railroad, however trivial and incidental, is subject to the Railroad Retirement Tax Act on its entire wage bill. So even if the Atchison, Topeka and Santa Fe Railway occupied only one-tenth of one percent of the space in the Railway Exchange Office Building, and the building's maintenance staff devoted only one-tenth of one percent of its time to maintaining the railroad's offices, Standard Office Building would have to pay railroad retirement tax on the staff's entire wages. (At the same time, every member of the staff would become eligible for a full railroad pension, assuming the Railroad Retirement Board acquiesced in the IRS's interpretation.) No

one would describe this conclusion as a product of profound intellection, so we are puzzled that the Internal Revenue Service required half a century to arrive at it.

 Neither position is tenable. Standard's effort to distinguish between the "direct" performance of railroad service by operating employees and the "indirect" performance of such service by nonoperating employees is not only arbitrary but also unrelated to the apparent purpose of the statutory definition of employer. It is arbitrary because rail transportation is equally dependent on the people who operate the trains and the people who make it possible for them to operate the trains. If the railroad's president dictates some essential directive and his secretary fails to type and mail it, he might as well be talking to himself. If because of inadequate maintenance of the Railway Exchange Building the electricity fails, the operation of the railroad may be interrupted. The distinction is unrelated to the purpose of the statute because the words "performs any service ... in connection with [rail] transportation" were intended to exclude services unrelated to rail transportation, such as operating an amusement park open to the public on land owned by the railroad, rather than to make a hair-splitting distinction between workers who "really" run the railroad and those who back up the former group. The Act covers "substantially all those organizations which are intimately related to the transportation of passengers or property by railroad in the United States." S.Rep. No. 818, 75th Cong., 1st Sess. 4 (1937). This would describe a wholly owned subsidiary to which a railroad spun off its entire nonoperating staff.

The government's position is no more attractive, though, as it would require an employer to pay railroad retirement tax on 100 percent of its employees' wages just because the employer was affiliated with a railroad and provided some services, however negligible, to the railroad. We asked the government's counsel whether the statute would apply if the railroad bought a fire insurance company one percent of whose revenues came from insuring some of the railroad's terminal buildings. She said it would. *All* of the insurance company's employees would be entitled to railroad pensions. That is absurd, and would cause consternation throughout the increasingly diversified railroad industry. Every railroad affiliate that had even one railroad customer would be in grave jeopardy of owing railroad retirement tax on the wages of all of its employees.

The basic problem of this case is that the framers of the railroad retirement statutes did not envisage a world in which employees of railroad affiliates might spend part but not all of their time performing services for the railroad, as in this case, or in which some of the employees might provide services for the railroad and others not. Cf. *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 168–69, 101 S.Ct. 453, 456, 66 L.Ed.2d 368 (1980). Had the framers foreseen such a world, they would probably have provided for apportioning the affiliate's tax liability. Cf. H.R.Rep. No. 2668, 75th Cong., 3d Sess. 11 (1938). The portion of the employer's wage bill that represented services provided in connection with rail transportation would be taxed under the Railroad Retirement Tax Act, the rest of the wage bill under the Social Security Act. Some employees would receive railroad pensions, others social security pensions, still others both. The complexities would not be overwhelming; many railroad workers and retirees, or their spouses, already have social security coverage. See Deford, *supra,* at 94–95; cf. *United States Railroad Retirement Bd. v. Fritz, supra,* 449 U.S. at 168–73, 101 S.Ct. at 456–57. It would be just another form of "integrated" pension liability, which is common today. See 1 CCH Pension Plan Guide ¶¶ 2621–2659 (1987).

*Adams v. Railroad Retirement Bd.,* 214 F.2d 534, 540–42 (9th Cir.1954), holds that a separable enterprise within the corporation can be treated as a railroad employer, but it does not contemplate the situation where the same employee does both railroad and nonrailroad work. The parties agree that Congress provided no mechanism for apportionment in such a case; if an employee does both kinds of work, either his entire

wage bill, or none of his wage bill, is subject to the Railroad Retirement Tax Act. There is no middle ground. Whether the Internal Revenue Service might by regulation provide for apportionment is not an issue before us; there is no such regulation.

The impossibility of apportionment under existing law makes it impossible to decide this case in a completely satisfactory manner. If we hold Standard Office Building not subject to railroad retirement tax we will create an arbitrary distinction between railroads that own their headquarters buildings and railroads that lease them from an affiliate. If we hold that it is subject to railroad retirement tax we will entitle workers who may spend less than half their time performing services for a railroad to railroad pensions on 100 percent of their wages, and we will thereby create an incentive for railroads and their affiliates to contract out such work in lieu of performing it through their own employees.

Given such unsatisfactory alternatives, it is hardly surprising that the case law interpreting section 3231(a) is itself unsatisfactory; it is also sparse. The logical starting point for a review of the major cases is the Internal Revenue Service's Revenue Ruling 55–586 (issued in 1955), though it is not, strictly speaking, a case. The ruling was in response to an inquiry from a railroad that owned a complex of office buildings and had formed a subsidiary to do the cleaning of the buildings. Beneath the buildings were railroad tracks and platforms but the subsidiary was not responsible for cleaning those. The railroad occupied only "a small amount" of the office space in the buildings. It used this space both for executive offices and for selling tickets. The Internal Revenue Service ruled that the subsidiary was not subject to railroad retirement tax, but the ruling is offered as a conclusion; there is no reasoning. The ruling supports Standard Office Building's position in this case, but not decisively, for it cannot be said that the railroad occupies only "a small amount" of the relevant office space. The absence from the ruling of any reasoning makes it impossible to say how important this distinction might be.

Two years later the Eighth Circuit held that a railroad's affiliate that owned and maintained "a building almost exclusively for use by a railroad company for ticket selling and general offices could reasonably be considered [to be performing] a service connected with and supportive of rail transportation." *Southern Development Co. v. Railroad Retirement Bd.*, 243 F.2d 351, 355 (8th Cir.1957). The court relied heavily on an earlier case, *Despatch Shops, Inc. v. Railroad Retirement Bd.*, 153 F.2d 644 (D.C.Cir.1946), which had held that a railroad affiliate engaged in repairing freight cars was performing a service in connection with rail transportation. A recent case similar to *Despatch* is *Railroad Concrete Crosstie Corp. v. Railroad Retirement Bd.*, 709 F.2d 1404, 1408–10 (11th Cir.1983). These decisions are inimical to Standard Office Building's attempt to distinguish between direct and ancillary railroad functions, but again are not decisive. Revenue Ruling 74–121, which adopts the holding in *Southern Development* (without bothering to cite Rev.Rul. 55–586), emphasizes that the building was used "almost exclusively" by the railroad. In the earlier ruling only a "small amount" of the space in the building had been so used. The present case falls right in the middle.

Next, and veering strongly in Standard's direction, is our decision in *ITEL Corp. v. United States Railroad Retirement Bd.*, 710 F.2d 1243 (7th Cir.1983). The question was whether ITEL's "Rail Division," which was in the business of leasing freight cars, was performing a service in connection with rail transportation. ITEL was primarily a computer-leasing company but owned several small railroads in addition to its computer business and the Rail Division. About 12 percent of the Rail Division's revenues were derived from leasing rail cars to its rail affiliates, although fewer than 5 percent of the division's employees were involved in these transactions. We held that the Rail Division was not performing a service in connection with rail transportation. Since a railroad can't oper-

ate without rail cars, this holding may seem to support Standard's view that only the "hands on" operating employees (plus senior executives), should they happen to be employed by an affiliate of the railroad rather than by the railroad itself, would be performing a service in connection with rail transportation within the meaning of the railroad retirement statutes. But the ground of our decision was different. Noting that the statutory language derived from the provision in the Interstate Commerce Act defining the Interstate Commerce Commission's authority to regulate railroad affiliates, we held that a service not subject to the Commission's regulatory authority is not covered by the railroad retirement acts either. See *id.* at 1246. We distinguished *Southern* and *Despatch* as cases in which the formation of the affiliate "intentionally undermined" those acts, *id.* at 1247, and concluded that only affiliates "who in fact exist only to serve their rail carrier parents and whose primary purpose is to remove workers from the Acts' coverage" are caught by the affiliate provision, *id.* at 1248. Since the ICC does not regulate (not directly, anyway—an important qualification, as we are about to see) the leasing of rail cars to railroads, and since ITEL's Rail Division did not exist primarily to serve its railroad affiliates and was not trying to remove workers from the railroad retirement acts' coverage, it was not covered.

Our attempt to yoke together the Interstate Commerce Act and the railroad retirement acts overlooked, however, the asymmetry of the regulatory schemes. Suppose a railroad spun off all its brakemen into a subsidiary. Although the function performed by the brakemen would not be directly subject to the Commission's price and service regulation, because it wouldn't be a carrier service—that is, a service sold to shippers or passengers—there would be indirect regulation, because the ICC can always disallow improvidently incurred costs of service. See, e.g., *Sioux City Terminal Ry. Switching*, 241 I.C.C. 53, 62 (1940). The same thing was true of the rail cars leased by ITEL's railroad subsidiaries from its Rail Division. Indeed, regulatory

agencies traditionally monitor transactions with affiliates of the regulated firm, in order to prevent profits from the regulated activity from being smuggled into the nonregulated firm in the form of exorbitant prices for the services sold by that firm to its regulated affiliate. See, e.g., *Indianapolis Airport Authority v. American Airlines, Inc.*, 733 F.2d 1262, 1268 (7th Cir. 1984). Thus there was no need to interpret the words performs "all services in connection with" rail transportation in the Interstate Commerce Act (49 U.S.C. § 1(3)(a), repealed in 1980) to reach services not directly regulated by the ICC; those services were subject to indirect regulation. But if a railroad could avoid railroad retirement tax by spinning off its brakemen into a subsidiary which then sold their services back to the railroad and not to the shipping public, so that these services were not regulated by the ICC in the sense used in ITEL, this would be a massive evasion of the railroad retirement acts, for there is no indirect regulation of retirement. That is why the court in ITEL added the second step of its analysis: even if the service performed by the affiliate is not a (directly) regulated service, it is subject to those acts if the intent is to undermine them. Really the whole weight of the analysis falls on the second step, which by making intent the central issue injects an undesirable element of uncertainty into the administration of the railroad retirement acts.

Finally, *Atlantic Land & Improvement Co. v. United States, supra*, held that a railroad affiliate which operated a phosphate loading facility was an employer subject to railroad retirement tax on the wages of the longshoremen who operated the facility. The facility was essential for unloading phosphate from the railroad's cars onto ships, which was the longshoremen's only duty. Reaching back to *Railroad Retirement Bd. v. Duquesne Warehouse Co.*, 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946), which had held that a warehouse affiliate which loaded and unloaded freight for the railroad was a railroad retirement employer, the court in *Atlantic* emphasized, consistently with *ITEL*, that the un-

loading of phosphates was a tariffed service. See 790 F.2d at 856. Now the provision of janitorial service in offices occupied by a railroad is not separately tariffed; but as its cost (unless improvident) is recoverable in the railroad's rates, because it is reflected in the rental paid for the offices and that rental is part of the railroad's cost of service, we are unclear why this should matter. The difference between a separately tariffed item and one merged in with other input costs is as irrelevant to the purposes of the railroad retirement laws as the difference between local and long-distance calls (the latter usually billed to clients as expenses, the former treated as overhead and recovered in the charge for professional services) is irrelevant to the recovery of fees and expenses under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. See *Henry v. Webermeier,* 738 F.2d 188, 192 (7th Cir.1984).

Our review of the parties' contentions, the case law, and administrative interpretations suggests that no simple rule is tenable under the statute as drafted, with the possible exception of a rule (perhaps implicit in the two revenue rulings when they are read together) that would focus on the extent of the railroad's use of the affiliate's facilities; but such a rule is not attractive in a case such as this, where the railroad occupies neither a small portion of the facilities nor all or almost all, but is roughly a 50 percent tenant. The best approach in the circumstances, pending congressional or administrative revision or clarification of the statute (which we urge), is one that will minimize corporate reorganizations designed to avoid railroad retirement tax liability and will protect reasonable expectations.

█ Standard Office Building Corporation was formed to operate the Railway Exchange Building 35 years before the passage of the Railroad Retirement Tax Act. Although the percentage of office space occupied by the Atchison, Topeka and Santa Fe Railway has grown since 1902, the Act could not have had anything to do with this; the number of maintenance workers whose classification is at stake is too small to have affected the headquartering of the railroad executives. Many of the railroad's executives are housed in another building, in Topeka, owned by the railroad, and the maintenance staff of that building is employed by the railroad and hence is subject to the Railroad Retirement Tax Act. The railroad has not attempted to get out from under the Act by spinning off the building to an affiliate which would then lease space to the railroad and employ the building's maintenance staff. The only thing that makes the present case financially significant is that many tax years are involved, but this is only because until recently no one thought that Standard Office Building might be an employer for railroad retirement tax purposes.

The maintenance workers in the Railway Exchange Building have never belonged to railway unions, and the unions they do belong to have negotiated pension arrangements with Standard Office Building that presuppose the applicability of the Social Security Act rather than the Railroad Retirement Act. These workers would be surprised to find they were entitled to railroad pensions; it would be a windfall, since their wages were calculated on the basis of the lower social security tax and may therefore be higher than they would have been otherwise. There would be a windfall in an additional sense: these workers would be entitled to full railroad pensions for half-time railroad work—if that is what maintenance of an office building that happens to be occupied by railroad executives and their staffs should be called. Maybe it should be (*Southern Development*), but the classification is sufficiently problematic to make the Internal Revenue Service's unexplained and unannounced decision to reverse (or at least deviate from the most natural interpretation of) Revenue Ruling 55–586 surprising.

Also, it is merely an accident that these maintenance workers are employed by Standard Office Building Corporation rather than by the building manager (an independent contractor) who supervises them; if we hold that they are providing a railroad service, Standard might simply switch them onto the contractor's payroll, and

thereby avoid the tax. Another consideration is that statutes governing railway labor, including the retirement acts, operate essentially to ratify compromises reached between the railroads and the railroad unions. See *United States Railroad Retirement Bd. v. Fritz, supra,* 449 U.S. at 190–91, 101 S.Ct. at 467; *Railroad Retirement Bd. v. Duquesne Warehouse Co., supra,* 326 U.S. at 451, 66 S.Ct. at 240. The IRS's new position threatens to upset that compromise by bringing a new group of workers into the railroad pension system, though apparently no one connected with the industry wants them to be there. A final, related consideration is that since an employee whose wages are taxable under the Railroad Retirement Tax Act is entitled to a railroad pension (because the statutory definitions of covered employer are identical under the Railroad Retirement Act and the Railroad Retirement Tax Act), the position taken by the Internal Revenue Service might expand entitlement to such pensions beyond the scope that the Railroad Retirement Board, which administers the railroad pension system, has seen fit to insist on. No one seems to know whether the additional taxes that would be collected from employers and employees would be sufficient to fund the pensions to which the newly covered employees would be entitled and, if not, what the implications would be for the fiscal integrity of the program. Apparently the IRS adopted its view of the scope of section 3231(a) without consulting the Railroad Retirement Board—poor communication between these two bodies being an old problem, see *Employer Liability for Taxes Under the Railroad Retirement Tax Act,* Hearing Before the Subcomm. on Oversight of the H.R. Comm. on Ways and Means, 96th Cong., 1st Sess., ser. 96–61, at 34–35 (1979).

We reverse the district judge's ruling that Standard Office Building Corporation is an employer within the meaning of 26 U.S.C. § 3231(a). But we express no opinion on what its tax status would be if it had been formed after the Railroad Retirement Tax Act was passed or if its railroad affiliate occupied all, or a substantially greater fraction, of the building than it did during the years relevant to this lawsuit.

■ Next is the statute of limitations issue—now moot as to Standard Office Building, but the main issue presented by Santa Fe Land Improvement's appeal. The statute of limitations is, as we said, three years, 26 U.S.C. § 6501(a), but it never begins to run if the taxpayer files no return, 26 U.S.C. § 6501(c); see *Commissioner v. Lane-Wells Co.,* 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944). Santa Fe Land Improvement filed a return—only it was a social security tax return rather than a railroad retirement tax return, and the government considers that the equivalent of no return. The government's position implies that the company is liable for railroad retirement tax right back to 1937, despite the Railroad Retirement Board's ruling in 1949 that it was not a railroad employer.

As our discussion of Standard Office Building's appeal showed, the question whether an employer must pay railroad retirement tax or social security tax can be exceedingly difficult to answer. Although the appellate record does not disclose the activities of the Santa Fe Land Improvement Company in relation to the Atchison, Topeka and Santa Fe Railway, and thus does not enable us to determine how difficult the question is in relation to Santa Fe Land Improvement Company, the government does not contest the company's assertion that it filed social security tax returns in the sincere and reasonable belief that it was subject to social security tax rather than railroad retirement tax. Furthermore, Santa Fe Land Improvement Company and its affiliates (including the railroad) file consolidated corporate income tax returns, regularly audited by the Internal Revenue Service, which for this or other reasons is well aware of the corporate relationship between the railroad and the land improvement company and has long been aware as well of the possibility that the correct employment tax is the railroad retirement tax rather than the social security tax. It has been aware of this possibility since at least 1949, when the Railroad Re-

tirement Board determined that Santa Fe Land Improvement Company was not subject to the Railroad Retirement Act and advised the IRS of its ruling. Although there is a minor difference between the bases for the two taxes, the Internal Revenue Service is well able to assess railroad retirement tax on the basis of the information contained in a social security tax return; indeed the amount of such tax that it assessed against both appellants was based on the social security tax returns they had filed.

■ Since the returns gave the Internal Revenue Service all the information it needed to assess the tax, and it already knew everything it needed to know in order to decide whether either appellant was subject to railroad retirement or social security, it would seem that the statute of limitations started to run with the filing of each social security tax return. Cf. Rev.Rul. 82–185. If not, it is hard to see how a company in the position of these appellants could protect itself from indefinite liability. The principal talking points the government has against this conclusion are a dictum in *Germantown Trust Co. v. Commissioner,* 309 U.S. 304, 60 S.Ct. 566, 84 L.Ed. 770 (1940), and a holding in the *Atlantic Land & Improvement* case cited earlier. *Germantown* held that a return filed on behalf of a trust that thought itself taxable as an association started the statute of limitations running even though the trust actually was taxable as a corporation and hence should have filed a different return. This is a solid precedent for Santa Fe—except that in the course of its opinion the Court remarked that the return that was filed "contained all of the data from which a tax could be computed and assessed although it did not purport to state any amount due as tax." 309 U.S. at 308, 60 S.Ct. at 568. This statement is dictum, in the sense of a discussion readily detachable from the opinion without impairing the opinion's essential reasoning, because the Court wasn't faced with a case where the wrong return contained something less than *all* the necessary data. Here not all of the data were on the wrong return, because of the minor difference between the tax bases. We

don't know what weight the Court in *Germantown* would have given such a difference.

The government appears, by the way, to concede that if the returns actually filed had contained all the data necessary to compute railroad retirement tax, the taxpayers would be off the hook. In *Commissioner v. Lane-Wells Co.,* a no-return case, rather than, as here, a wrong-return case (in *Lane-Wells* the taxpayer was required to file two separate returns for two separate taxes, and filed only one), the Court pointed out that it made no difference whether the one return that was filed contained all the data necessary to compute the other tax as well. See 321 U.S. at 223, 64 S.Ct. at 513. Harsh as this result may seem, it can be defended by pointing out that a taxpayer who happens to be liable for two different taxes should not get better treatment than a taxpayer who happens to be liable for only one tax—the result if the former could plead the statute of limitations, though it didn't file a return for one of the taxes, while the latter could not. The present case, in contrast, is one where the taxpayer owes one tax, but he doesn't know whether it's social security or railroad retirement tax, and files the wrong form in good faith.

*Atlantic Land & Improvement* might seem to be a case just like the present, because the taxpayer filed social security rather than railroad retirement tax returns; was held to be liable for the latter tax; and was denied the benefit of the three-year statute of limitations because the social security tax returns that the company filed "did not contain the necessary information from which the IRS could compute AL & I's RRTA tax liability." 790 F.2d at 860. Unlike this case, however, there is no indication that the IRS based its assessment on the company's social security tax returns. Neither the briefs nor the opinion in the case say anything about the basis on which the IRS made its assessment. Maybe the returns filed by the taxpayer in that case really didn't contain enough information for the assessment; but we know that the returns in this case did.

Why minor and indeed irrelevant discrepancies (irrelevant because the IRS decided that the social security tax returns contained enough information to enable it to assess the railroad retirement tax due) between the information on the wrong return and the information that would have been shown on the right return should defeat the application of the statute of limitations, when as is conceded the taxpayer made a reasonable and good-faith error about which form it must file, eludes our understanding. If the Santa Fe Land Improvement Company had filed the railroad retirement tax return but had underpaid the tax due, it would have given the IRS no more information than the IRS had by virtue of the social security tax returns and its previous audits, which showed that the company had a railroad affiliate; yet the statute of limitations would have started to run.

If ever the wrong return can start the statute of limitations running, this is the case. It is not like *Durovic v. Commissioner*, 487 F.2d 36, 39–40 (7th Cir.1973), where the filing of an information return by a partnership was held inadequate to start the statute of limitations running for a partner who failed to file an individual tax return. Here the taxpayers filed tax returns and of the right kind (i.e., payroll tax returns), disclosing the requisite information, but classifying the taxpayer under what the Internal Revenue Service now believes is the wrong employer heading.

So we agree that Santa Fe Land Improvement Company is entitled to the benefit of the three-year statute of limitations—but not that it is entitled to the benefit of section 530 of the Revenue Act of 1978, Pub.L. 95–600, 92 Stat. 2763, 26 U.S.C. § 3401 note, which forgives certain employers who erroneously classified employees as independent contractors rather than as employees from having to pay past-due employment taxes. See S.Rep. No. 1263, 95th Cong., 2d Sess. 210 (1978), U.S. Code Cong. & Admin.News 1978, pp. 6761, 6973. A vice-president of Santa Fe Industries (predecessor to Santa Fe Southern Pacific Corporation) itself testified to this understanding of the purpose of the statute. See *Employer Liability for Taxes Under the Railroad Retirement Tax Act, supra,* at 10–18. Of course a statute can have a broader scope than the problem that called it into being, but this one does not, because it applies only if, "for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period." § 530(a)(1)(A). Santa Fe Land Improvement Company always treated the workers that the IRS wants to reclassify from social security to railroad retirement employees as employees rather than independent contractors.

REVERSED.