**LIVINGSTON REBUILD CENTER, INC., Petitioner,**

v.

**RAILROAD RETIREMENT BOARD, Respondent.**

No. 91–3049.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1991.

Decided July 22, 1992.

Order on Denial of Rehearing Aug. 17, 1992.

Mitchel H. Kider (argued), Christopher E. Hagerup, Weiner, McCaffrey, Brodsky, Kaplan & Levin, Washington, D.C., for petitioner.

Steven A. Bartholow, Edward S. Hintzke, Marguerite P. Dadabo (argued), Catherine C. Cook, Railroad Retirement Bd., Bureau of Law, Chicago, Ill., for respondent.

J. Thomas Garrett, Paducah, Ky., for VMV Enterprises, Inc. and Nat. Ry. Equipment Co. amicus curiae.

Before WOOD, Jr., COFFEY, and EASTERBROOK, Circuit Judges.*

EASTERBROOK, Circuit Judge.

Railroads pay extra federal taxes to finance the benefits afforded to their employees under the Railroad Retirement Act and the Railroad Unemployment Insurance Act. Recognizing that firms would like to structure their operations to escape these onerous levies, Congress defined a covered "employer" broadly, including not only freight and passenger carriers but also "any company which is directly or indirectly owned or controlled by, or under common control with, one or more [railroads] ... and which operates any equipment or facility or performs any service ... in connection with the transportation of passengers or property by railroad". 45 U.S.C. § 231(a)(1)(ii). We must decide whether a firm that repairs locomotives "performs any service ... in connection with the transportation of passengers or property by railroad".

Livingston Rebuild Center operates a repair service in Livingston, Montana. The Northern Pacific Railway built the facility before the turn of the century to repair its locomotives. After a merger in 1970 that combined the Northern Pacific with two others into the Burlington Northern Railroad, the railroad assigned much of this work to other shops. It closed the Livingston works in 1985. Livingston Rebuild Center purchased and reopened the shop in 1988. Today about 95% of its business is rebuilding railroad locomotives and other rolling stock, although the Center wants to expand into the repair of other heavy-duty equipment. The Railroad Retirement Board has concluded that the Center is an "employer" under the statutes it administers because Dennis Washington, its principal investor, also is the controlling shareholder of Montana Rail Link (MRL), which offers rail service on 544 miles of its own track, plus 286 miles of the Burlington Northern's track, in Montana. Approximately 25% of the Center's business comes from MRL, and MRL places some 25% of its rebuilding business with the Center. Although the Center is thus not a captive in the sense that it is devoted predominantly to serving one railroad's needs, it is nonetheless "under common control with" MRL, making it a statutory "employer" if rebuilding rolling stock is a "service ... in connection with the transportation of passengers or property by railroad".

■ Determining the nature of the Board's action has caused us some trouble. Its order recites that it "affirms the determination of the Deputy General Counsel" but does not direct anyone to do anything. This raises the possibility that the Board has issued an advisory opinion—which Officers operating under Article II of the Constitution may do freely, but which persons exercising the "judicial Power" under Article III may not review. The Deputy General Counsel wrote a letter to the Center, expressing his opinion "that Livingston Rebuild Center, Inc. is an employer under the Railroad Retirement and Railroad Unemployment Insurance Acts". The letter contains no directions and names no consequences. The Deputy General Counsel also entered a Form G–215, which likewise issues no commands. It does nothing but record that "service is held creditable" from June 1, 1988, to date. This means that the Center's employees receive credit toward railroad pensions, disability benefits, and unemployment insurance; it does not appear to require the Center to pay taxes or do anything in particular. If the Board wants to give money to its employees, how is the Center aggrieved?

To the constitutional proscription of advisory opinions, Congress added a special rule for taxation. Usually a person unhappy with a decision affecting his taxes must pay and ask the court for a refund. Except as a short list of statutes permits, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person". 26 U.S.C. § 7421(a). No surprise, then, that suits for refunds are the principal means of obtaining judicial review of coverage questions under the Railroad Retire-

---

* Judge Wood took senior status after the oral argument of this case.

ment Act and the Railroad Unemployment Insurance Act. E.g., *Standard Office Building Corp. v. United States,* 819 F.2d 1371 (7th Cir.1987) (suit for refund of taxes collected under Railroad Retirement Tax Act). No one may run to court demanding review of a letter in which the Deputy General Counsel of the Internal Revenue Service concludes that a particular tax is due. A taxpayer cannot obtain direct judicial review of Revenue Rulings. How, then, is the Center entitled to review of a letter stating an opinion that if correct may increase its taxes? The Railroad Retirement Board did not even draw the conclusion that the Center must pay; its Deputy General Counsel stopped with the legal conclusion that the Center is an "employer." Congress authorized judicial review of decisions by the Board "determining the rights or liabilities of any person", 45 U.S.C. § 231g, not of letters expressing opinions. See also 45 U.S.C. § 355(f) (authorizing review at the behest of a "party aggrieved by a final decision" concerning a claim for unemployment benefits). An agency's bare legal conclusion is not reviewable. See *Taylor–Callahan–Coleman Counties District Adult Probation Department v. Dole,* 948 F.2d 953 (5th Cir. 1991); cf. *First National Bank of Chicago v. Comptroller of the Currency,* 956 F.2d 1360, 1364–65 (7th Cir.1992); *Chicago Board of Trade v. SEC,* 883 F.2d 525, 529–31 (7th Cir.1989); *Thomas v. New York,* 802 F.2d 1443 (D.C.Cir.1986) (Scalia, J.). Unless something lurks beneath the surface, a legal conclusion is all we have.

Neither in their briefs nor at oral argument did the parties explain any consequence of the Deputy General Counsel's letters—what the Center must do in response, the risks it takes if it does not. Cf. *FTC v. Standard Oil Co.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). After an unguided tour through the United States Code, we found one: An employer "shall file with the Board ... returns of compensation of employees". 45 U.S.C. §§ 231h, 356. The Board uses these to determine the employees' entitlements. One who fails to file required "returns of compensation" may be fined or imprisoned. 45

U.S.C. §§ 231*l*(a), 359(a). Taken in conjunction with §§ 231h, 356, the Board's decision that the Center is an "employer" requires it to report its workers' pay, and the risk of penalty for noncompliance permits immediate judicial review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ The Center presents a simple argument on the merits: an enterprise "performs ... service ... in connection with the transportation of passengers or property by railroad" only if it is subject to the jurisdiction of the Interstate Commerce Commission. See *ITEL Corp. v. Railroad Retirement Board,* 710 F.2d 1243, 1246 (7th Cir.1983). Repairing and rebuilding rolling stock is outside the ICC's jurisdiction, save for a potential indirect effect if the ICC concludes that expenditures were improvident and excludes costs from the rate base. The Board concedes this but contends that the Interstate Commerce Act does not exhaust the scope of its statutes.

Let us put the Interstate Commerce Act aside for a moment and ask: is rebuilding locomotives a "service ... in connection with the transportation of passengers or property by railroad"? One other court has addressed the question; it answered "yes." *Despatch Shops, Inc. v. Railroad Retirement Board,* 153 F.2d 644 (D.C.Cir. 1946). On textual grounds, that answer is inevitable. How could the rebuilding of locomotives *not* be "in connection with" railroad transportation? What produces that locomotion, other than a locomotive? During all the years the Northern Pacific and Burlington Northern operated the Livingston facility, no one doubted that its services were an essential input into rail transportation. Without functioning engines, a railroad cannot move people or freight.

During the hearings that led to the Railroad Retirement Act of 1937, a statute supported by both labor and management, a witness described the scope of the proposed legislation as linked to the Interstate Commerce Act. It is this testimony that led us to state in *ITEL* that "the activities embraced by the RRA and RUIA were

intended to be no broader than those embraced by the ICA." 710 F.2d at 1246. Of course, Congress does not enact "intents", and certainly not the intents of witnesses; it enacts texts, which may differ from the expectations of the sponsors. *American Hospital Ass'n v. NLRB,* — U.S. —, 111 S.Ct. 1539, 1544–46, 113 L.Ed.2d 675 (1991); *In re Sinclair,* 870 F.2d 1340 (7th Cir.1989); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.,* 814 F.2d 358, 364–65 (7th Cir.1987). Nothing in what Congress *enacted* links the Railroad Retirement Act to the Interstate Commerce Act; neither the phrase "service ... in connection with the transportation of passengers or property by railroad" nor any close approximation appears in the jurisdictional provisions of the Interstate Commerce Act. Senator Wagner thought that the text of the Railroad Retirement Act encompassed more than the Interstate Commerce Act did, 81 Cong.Rec. 6223 (1937), and the committee report implies that the Railroad Retirement Act is broader. S.Rep. No. 697, 75th Cong., 1st Sess. 7 (1937).

The divided panel that decided *ITEL* was uncomfortable with its conclusion because it recognized that a tie between the Interstate Commerce Act and the railroad retirement statutes allows railroads to subdivide their operations, placing even engineers and brakemen in subsidiaries that fall outside the purview of the Interstate Commerce Commission. Yet that maneuver would negate the application of the retirement and unemployment statutes to the core of their domain. So the panel ventured that the railroad retirement and unemployment acts would apply to non-carriers, if the affiliates were established to evade coverage. Neither the text of the statute nor the legislative history supports that approach; the panel invented it to mitigate the effects of its principal conclusion. If the railroad statutes really were limited by the ICC's jurisdiction, then arranging one's affairs to avoid that jurisdiction would be unexceptionable, just as it is lawful to take advantages of loopholes in other tax statutes (or, as the tax bar calls them, "opportunities for tax planning").

Tax shelters are not unlawful just because reducing taxes serves as a motivation. The shortcomings of a non-textual approach that in the end places all of its weight on intent, and so "injects an undesirable element of uncertainty into the administration of the railroad retirement acts", *Standard Office Building Corp.,* 819 F.2d at 1378, led us to reformulate our understanding and fall into line with the Supreme Court, which held in *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 454, 66 S.Ct. 238, 242, 90 L.Ed. 192 (1946), that the acts apply whenever "a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs."

*Standard Office Building* and *Duquesne Warehouse* prescribe the proper approach. Rebuilding locomotives is a service that "could be performed by the carrier"—and was, by Burlington Northern and predecessor, for more than a century. The cost is rolled into the line-haul tariffs, just as the expense of engineers and track repair is included. Searching for what could be included in tariffs creates problems when the affiliate does substantial non-railroad work; in *Standard Office Building* approximately half of the separately-incorporated building was occupied by firms outside the railroad industry. It creates problems when, as in *ITEL,* the parent corporation is not really a railroad (*ITEL* was an equipment-leasing firm that happened to own some tiny railroads). Today's case presents no such problem. Montana Rail Link is a railroad and nothing but; the Center gets 95% of its business from railroads, and the service it provides is not only connected with but also essential to rail transportation.

■ The Railroad Retirement Act is a creaky statute, presuming that "railroads" are distinct entities; today many railroads are parts of conglomerates, and an attempt to isolate "the railroad" in the larger enterprise is bound to cover at once too much and too little. But reconciling the statute with current forms of corporate organization—and with the fact that railroads compete vigorously against other modes of

transportation that are not subject to special regulation and taxation—is a job for the political branches. *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 827, 98 S.Ct. 2122, 2129, 56 L.Ed.2d 728 (1978). Nothing in the statute has changed since 1946, when *Despatch Shops* held that rebuilding rolling stock satisfies its criteria. Our reading leads us to conclude that *Despatch Shops* is correct.

Given this independent conclusion, we need not decide whether the Board's reading of the statutes is entitled to deference. The Board asked us to accept its view, citing *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). (Oddly, neither side mentions *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).) We have steered clear of the subject because the Board is not the only entity involved. The Commissioner of Internal Revenue collects the taxes due under the statutes, and these decisions may be reviewed in the district court, tax court, and claims court. *Standard Office Building* suggests, 819 F.2d at 1374, that the district court's decision in a refund suit receives deference because whether a firm is an "employer" is a mixed question of law and fact. Appellate deference to the Commissioner, the Board, and trial courts would produce a muddle if these institutions should disagree. Then there is *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990), holding that deference depends on delegation to the agency; statutes addressed directly to courts receive independent interpretation. How *Adams Fruit* applies to the railroad acts we need not venture.

AFFIRMED.

### ORDER

Petitioner filed a petition for rehearing and suggestion of rehearing en banc on August 4, 1992. No judge in regular active service has requested a vote on the suggestion of rehearing en banc, and all of the judges on the panel have voted to deny rehearing. The petition for rehearing is therefore DENIED.