In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3945

HERZOG TRANSIT SERVICES,
INCORPORATED, et al.,

*Petitioners*,

*v.*

UNITED STATES RAILROAD
RETIREMENT BOARD,

*Respondent*.

Petition for Review of an Order
of the Railroad Retirement Board
No. 09-53

ARGUED MAY 26, 2010—DECIDED OCTOBER 22, 2010

Before RIPPLE, KANNE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Herzog Transit Services ("Herzog")
operates, under contract with Dallas Area Rapid Transit
("DART") and Fort Worth Transportation Authority ("the
T"), a commuter rail service on a line connecting Dallas
and Fort Worth, Texas. Herzog dispatches all train traffic
along this line, including interstate freight trains. The

Railroad Retirement Board ("RRB" or "Board") determined that Herzog is a covered employer under the Railroad Retirement Act[1] ("RRA") and the Railroad Unemployment Insurance Act[2] (which we shall sometimes refer to collectively as "the Acts"), but only with respect to these dispatching operations. Herzog, DART and the T petition for review of this determination. For the reasons set forth in this opinion, we deny the petition for review.

# I

## BACKGROUND

### 1.

Herzog is a contract operator of commuter railroads. In 1994, the RRB determined that Herzog was not a covered employer under the Acts. At that time, Herzog operated commuter rail services in the Miami, Florida area for the Tri-County Commuter Rail Organization (now known as South Florida Regional Transportation Authority, or SF RTA). Since then, Herzog has engaged in six new operations in five other states: North Carolina, New Jersey, New Mexico, California and Texas. This petition concerns only the operation in Texas.

DART and the T jointly own a line of train track between Dallas and Forth Worth, Texas. On this line, DART and the T provide commuter rail service, known as the

---

[1]  45 U.S.C. §§ 231-231v.

[2]  45 U.S.C. §§ 351-69.

Trinity Railway Express ("Trinity" or "TRE"). These commuter trains have been operated by Herzog since 1996. Four interstate freight carriers also operate on the line. The Union Pacific Railroad Company and the BNSF Railway Company, interstate freight carriers, use the entire line. The Dallas, Garland & Northeastern Railroad and the Fort Worth & Western Railroad, also interstate freight carriers, use only part of the line.

Since 2001, Herzog has performed dispatching functions for all train traffic on the line. The operating agreements among the participating lines (DART, the T and the freight carriers) require Herzog to give priority to the Trinity trains, but also require it to allow the freight carriers to use the line.

**2.**

In November 2003, Richard C. Beall, an employee of Herzog, wrote to the RRB and asked the Board to determine that Herzog was a covered employer under the Acts. In February 2006, the Board ordered that a hearing be held on whether there has "been a change in the operations of Herzog Transit Services, Inc., which would affect its status as an employer under the Railroad Retirement and Railroad Unemployment Insurance Acts." A.R. 1256. A hearing was held on May 16, 2006. The Hearing Examiner issued a report, and the Board rendered a decision. The Board affirmed and adopted that decision upon reconsideration. We shall discuss in detail only the part of the Board's decision pertinent to this

petition, namely, the Board's discussion of Herzog's dispatching activities in Texas.[3]

The Board framed the issue as whether Herzog, a contractor, was a covered employer under the Acts.[4] Focusing on the nature of the activity conducted by Herzog, the Board emphasized that "dispatching is as inextricable a part of the actual motion of trains as is the operation of a train's locomotive controls by the engineer." A.R. 7. Dispatchers, said the Board, direct and control the movement of trains; no train can move without an order from the dispatcher. Therefore, where "the train dispatching includes trains that operate interstate, the entity dispatching trains operates as a rail carrier" under the Acts. *Id.* Because Herzog's principal business is intrastate passenger service, however, the Board found only its dispatching unit to be a covered employer.[5]

---

[3] In addition to the portion of the decision concerning Herzog's dispatching activities in Texas, the Board also held that, in all *other* respects, Herzog was not a covered employer under the Acts.

[4] The Board rejected the argument, not renewed on appeal, that it should have focused on whether the individual dispatchers in question were statutory employees of a railroad under 45 U.S.C. § 231(b)(1) and (d)(1).

[5] 20 C.F.R. § 202.3(a) provides in part:

With respect to any company or person principally engaged in business other than carrier business, but

(continued...)

In support of this conclusion, the Board identified five considerations. First, the Board noted that the Federal Railroad Administration ("FRA") has issued regulations highlighting the control of dispatchers over train movement.[6] Second, the Board noted that a common carrier is the insurer of the goods it carries. Third, because dis-

---

[5] (...continued)

which, in addition to such principal business, engages in some carrier business, the Board will require submission of information pertaining to the history and all operations of such company or person with a view to determining whether some identifiable and separable enterprise conducted by the person or company is to be considered to be the employer.

[6] 49 C.F.R. § 241.5 provides that "dispatch" means in part:

(1) To perform a function that would be classified as a duty of a "dispatching service employee," as that term is defined by the hours of service laws at 49 U.S.C. 21101(2), if the function were to be performed in the United States. For example, to *dispatch* means, by the use of an electrical or mechanical device—

(i) To control the movement of a train or other on-track equipment by the issuance of a written or verbal authority or permission affecting a railroad operation, or by establishing a route through the use of a railroad signal or train control system but not merely by aligning or realigning a switch; or

(ii) To control the occupancy of a track by a roadway worker or stationary on-track equipment, or both . . . .

(italics in original).

patching is an indispensable component of carrier service and must be delivered with such service, Herzog's position was analogous to those of contractors and other entities previously found by the Board to be covered employers.[7] These previous determinations included a commuter authority that provided dispatching services for interstate freight trains operating on its line. Fourth, the Board noted that, if Trinity (DART and the T) performed the interstate freight service itself, it would be a covered employer; Trinity could not remove an essential aspect of carrier operation from coverage by removing it from the covered interstate freight carriers. In this context, the Board referred to its decision in *Employer Status Determination—Railroad Ventures, Inc.*, B.C.D. 00-47 (served Nov. 7, 2000). *Railroad Ventures* set forth a test to determine when a rail line owner that contracts out railroad activities nevertheless remains a covered employer. The Board stated that under this test, Trinity (DART and the T) would not have been a covered employer when the interstate freight trains performed their own dispatching. Once it "took back" control over dispatching operations and assigned them to Herzog, however, Herzog became an employer as lessee of the dispatching operations. A.R. 41-

---

[7] *See Employer Status Determination—Rail Temps, Inc.*, B.C.D. 03-38 (served May 6, 2003); *Employer Status Determination—Mass. Bay Commuter R.R. Co.*, B.C.D. 03-23 (served Mar. 3, 2003); *Employer Status Determination—S. Cal. Reg'l R. Auth., Segregation of Dispatching Dep't*, B.C.D. 02-12 (served Feb. 12, 2002).

42. Fifth, the Board emphasized that its decision would not necessarily have adverse consequences on other similarly situated entities because the Board considers, in each case, the particular facts before it.

The Management Member dissented, but wrote only that he disagreed with "the portion of the majority's decision that affirms the Board's initial determination finding dispatchers working for Herzog Transit Services to be covered under the Railroad Retirement Act and the Railroad Unemployment [I]nsurance Act." A.R. 9A. Herzog, DART and the T now petition for review.[8]

## II

## ANALYSIS

We begin, as we must, with the governing statutory scheme. We first shall describe it generally. We then shall turn to a more precise discussion of the provisions most directly relevant to our analysis.

### A.

### 1.

In the early part of the twentieth century, private railroads administered pension plans. These plans provided

---

[8] Because Herzog is the party directly aggrieved by the Board's decision, the arguments we shall address pertain to the status of Herzog. Therefore, for clarity, we shall refer to the joint petitioners as "Herzog."

small benefits and had strict eligibility requirements. As a result, they provided little incentive for older employees to retire, thereby keeping younger workers out of the industry. But the older workers were dissatisfied as well; as one former Associate General Counsel to the RRB has put it, "[t]he older men complained because these pension plans were like an umbrella that did not open whenever it rained, offered little protection when it did open, and hardly any when the heavy rains came." David B. Schreiber, The Legislative History of the Railroad Retirement and Railroad Unemployment Insurance Systems 2 (1978) (hereinafter Schreiber).

The Railroad Retirement Act was directed toward remedying this situation. The first version of the Act was enacted in 1934 and struck down by the Supreme Court. A new Act was passed in 1935 and promptly challenged in court. A district court enjoined the Board from compelling the railroads to provide information needed to administer the Act; however, the court did not prevent the Board from adjudicating annuities and making awards if it had the necessary information. Schreiber at 16-17. While the litigation was pending on appeal, a third Act, which represented a negotiated compromise between management and labor that both sides supported, was enacted in 1937. *See* S. Rep. No. 697, at 2 (1937).[9] The 1937 Act was styled as an amendment to the 1935 Act, but it was

---

[9] The statute was revised significantly in 1974, although the coverage provision at issue in this case was not substantively altered.

essentially a rewriting. *See* 50 Stat. 307 (1937). The Act establishes annuity benefits for retired workers in the railroad industry. Full annuities are available in the current version of the Act to those who have completed ten years of service to one or more employers (or five years accruing after 1995) and reach the retirement age provided by the Social Security Act, as well as to those who have reached the age of sixty and completed thirty years of service.[10] 45 U.S.C. § 231a(a)(1)(i), (ii). The amounts of these annuities are calculated pursuant to 45 U.S.C. § 231b. Reduced annuities are available to those who have reached the age of 62 and completed at least ten (or five, all accruing after 1995) but fewer than thirty years of service. *Id.* § 231a(a)(1)(iii). Additionally, certain disabled individuals are entitled to annuities. *Id.* § 231a(a)(1)(iv), (v). The statute also provides for annuities to spouses, as well as supplemental annuities to certain employees. *Id.* § 231a(b), (c). When an annuity has become due but has not been paid prior to the individual's death, it is payable to a surviving spouse, who was living with the individual at the time of the individual's death. *Id.* § 231e(a)(1). In light of these benefits, it is unsurprising that the Supreme Court has observed that "[t]he Railroad Retirement Act is substantially a Social Security Act for employees of common carriers." *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 254 (1963) (per curiam) (quotation marks and citation omitted).

---

[10] Those with fewer than ten years of service (or five years accruing after 1995) are covered by the Social Security system. 20 C.F.R. § 404.1401.

The Retirement Act is just one component of the over-all statutory scheme. The Railroad Unemployment Insurance Act, enacted in 1938, establishes a system of unemployment insurance for this same group of employees. *Cheney R.R. Co. v. R.R. Ret. Bd.*, 50 F.3d 1071, 1074 (D.C. Cir. 1995). Employers and employees subject to the Acts must pay a payroll tax akin to the social security tax required of other employers and employees. These taxes, established by the Railroad Retirement Tax Act, are higher than the social security tax. *See Standard Office Bldg. Corp. v. United States*, 819 F.2d 1371, 1373 (7th Cir. 1987).

The Retirement Act aimed to protect the nation's railroad employees. *See* 48 Stat. 1283 (1934) ("AN ACT To provide a retirement system for railroad employees, to provide unemployment relief, and for other purposes."); H. Rep. 1988, at 1 (1934) ("The bill proposes to establish a railroad retirement pension system for all carriers subject to the Railway Labor Act and all employees of such carriers.").[11] In order to prevent railroads from avoiding the Act by creative corporate structuring, the Act from its inception has covered "any company which is directly or indirectly owned or controlled by, or under common control with, one or more employers . . . and which operates any equipment or facility or performs any service . . . in connection

---

[11] The coverage provisions of the Railway Labor Act did not materially differ from those of the Railroad Retirement Act. *Compare* 48 Stat. 1185 (June 21, 1934), *with* 48 Stat. 1283 (June 27, 1934).

with the transportation of passengers or property by railroad." 45 U.S.C. § 231(a)(1)(ii); *see also* 48 Stat. 1283 (1934). If not for this provision, railroads could remove most of their workers from the Act simply by setting up a wholly owned subsidiary. *See Despatch Shops, Inc. v. R.R. Ret. Bd.*, 154 F.2d 417, 419 (2d Cir. 1946).

In its current form, the Retirement Act defines a covered employer in five ways. In this case, the Board relied on 45 U.S.C. § 231(a)(1)(i), which has been a part of the Act, in similar form, since 1934. It provides that "employer" shall include

> (i) any carrier by railroad subject to the jurisdiction
> of the Surface Transportation Board under part A
> of subtitle IV of Title 49 . . . .

45 U.S.C. § 231(a)(1)(i).

The parties assume that "employer" is defined in identical fashion in the Unemployment Insurance Act. *See* Pet'r Br. 8 n.11 ("substantively identical"); Resp't Br. 3 ("substantially similar"). Other courts have so noted or assumed. *See Am. Orient Express Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 556 (D.C. Cir. 2007) (implicitly assuming); *Cheney R.R. Co.*, 50 F.3d at 1074 (explicitly noting); *Atl. Land & Improvement Co. v. United States*, 790 F.2d 853, 855-56 (11th Cir. 1986) (explicitly noting the "virtually identical" language). We agree.[12]

---

[12] For completeness, we note that the analogous provision of the Railroad Unemployment Insurance Act covers "a railroad subject to the jurisdiction of the Surface Transporta-

(continued...)

The Retirement Act and the Unemployment Insurance Act are administered by the Railroad Retirement Board.[13] The Board is an independent executive agency with three members, all appointed by the President. 45 U.S.C. § 231f(a). The Board adjudicates claims for benefits under the Act. *R.R. Ret. Bd. v. Duquesne Warehouse Co.*, 326 U.S. 446, 447 (1946); *see also* 45 U.S.C. § 231f(b). The Board also determines the status, as covered or non-covered, of particular employers and employees. 20 C.F.R. § 259.1. Its decisions, if they determine "the rights or liabilities of any person," may be appealed to the Courts of Appeals for the Seventh Circuit, the District of Columbia Circuit, or to the Court of Appeals in which the petitioner resides, "or will have had his principal place of business or principal executive office." 45 U.S.C. § 231g; 45 U.S.C. § 355(f).

**B.**

With this background, we turn now to an examination of the provisions most pertinent to the case before us.[14]

---

[12] (...continued)
tion Board under part A of subtitle IV of title 49." 45 U.S.C. § 351(b).

[13] The Tax Act is administered by the Internal Revenue Service. *Interstate Quality Servs., Inc. v. R.R. Ret. Bd.*, 83 F.3d 1463, 1464 (D.C. Cir. 1996).

[14] As we did in our decision in *Livingston Rebuild Center, Inc. v. Railroad Retirement Board*, 970 F.2d 295, 299 (7th Cir. 1992), (continued...)

As we noted earlier, the parties focus on the provision of the RRA that defines a covered employer as:

> (i) any *carrier by railroad* subject to *the jurisdiction of the Surface Transportation Board* under part A of subtitle IV of Title 49 . . . .

45 U.S.C. § 231(a)(1) (emphasis supplied). This subsection contains several terms and phrases that require further investigation.

### 1.

We turn first to the phrase "carrier by railroad." The RRA provides no definition of this term. Notably, however, the Interstate Commerce Commission Termination Act of 1995[15] ("ICCTA"), which delineates the jurisdiction of the Surface Transportation Board ("STB"), defines "rail carrier" as a "a person providing *common carrier* railroad *transportation* for compensation." 49 U.S.C. § 10102 (emphasis supplied). The RRB seemed to assume, and we see no reason to disagree, that Congress intended "carrier" to have the same meaning in both of these closely related statutes and that the RRA statute therefore affords no broader coverage than the ICCTA.

The ICCTA definition of "rail carrier" presents, in turn, its own internal issues. The ICCTA does not define

---

[14] (...continued)
we pretermit a determination of whether we owe the determination of the Board a particular degree of deference.

[15] 109 Stat. 803 (1995).

"common carrier." Other courts have assumed that the term should be given the same meaning as it is given in the common law: an entity that holds itself out to the public as offering transportation services to all who are willing to pay its tariff.[16]

The ICCTA also defines "transportation." That term is defined to include:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . .

49 U.S.C. § 10102(9).

---

[16] *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 46 (1st Cir. 2008); *Am. Orient Express Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007); *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 250 (3d Cir. 2007); Black's Law Dictionary 242 (9th ed. 2009) ("A commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee.").

**2.**

Section 231(a)(1) also defines employer by requiring that the "carrier by railroad" be subject to the jurisdiction of the Surface Transportation Board. The relevant statute, which is dependent on the definitional section we have just referenced, provides that the Board has jurisdiction over:

> *transportation by rail carrier* that is—
>
> (A) only by railroad; or
>
> (B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.

49 U.S.C. § 10501(a)(1) (emphasis supplied). STB jurisdiction attaches to such transportation that is part of the interstate rail network. *Id.* § 10501(a)(2)(A).

**C.**

With these statutory provisions as our decisional matrix, we now examine the RRB's resolution of the situation presented by this case.

**1.**

In determining that Herzog's dispatching operations were covered by the Acts, the Board reasoned that Trinity (DART and the T), as the owner of the rail line in question, formerly had leased the right to run interstate rail operations over its line to the four interstate freight rail owners that operate interstate freight trains over

its lines. Having retained no part of the interstate opera-
tion of rail transportation for itself, Trinity was not,
*during that earlier period*, a covered employer under the
Acts. In January 2001, however, Trinity altered that ar-
rangement by taking back one aspect of the right to run
interstate rail operations over its lines—dispatching—and
vesting that right in Herzog Transit, which also oper-
ated an intrastate commuter line over the same track.
Herzog then performed the dispatching function for
the interstate operations as well as the commuter line.
In the Board's view, Herzog's dispatching function con-
stitutes a necessary and integral part of the operation
of interstate trains over Trinity's tracks and, therefore,
its activity *as a dispatcher* constitutes operation as a rail
carrier subject to the RRA.


**2.**

In determining whether the Board's analysis comports
with the statutory mandate that we have described,
we believe that, as a first step, it is essential to keep in
mind two overarching considerations. First, the subsec-
tion of the RRA that we have analyzed is part of a
much broader provision that brings within the scope of
an "employer" many different entities.[17] These various

---

[17] 45 U.S.C. § 231(a)(1) provides:

The term "employer" shall include—

(i) any carrier by railroad subject to the jurisdiction of
the Surface Transportation Board under part A of

(continued...)

---

[17] (...continued)

subtitle IV of Title 49;

(ii) any company which is directly or indirectly owned or controlled by, or under common control with, one or more employers as defined in paragraph (i) of this subdivision, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad;

(iii) any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the property or operating all or any part of the business of any employer as defined in paragraph (i) or (ii) of this subdivision;

(iv) any railroad association, traffic association, tariff bureau, demurrage bureau, weighing and inspection bureau, collection agency and any other association, bureau, agency, or organization which is controlled and maintained wholly or principally by two or more employers as defined in paragraph (i), (ii), or (iii) of this subdivision and which is engaged in the performance of services in connection with or incidental to railroad transportation; and

(v) any railway labor organization, national in scope, which has been or may be organized in accordance with the provisions of the Railway Labor Act, as amended [45 U.S.C. 151 et seq.], and its State and

(continued...)

subsections are designed primarily to bring within the railroad retirement scheme employees who play many different roles in the interstate railway system of the United States. When read together, these subsections make clear that Congress envisioned a broad retirement program for employees playing many roles within the railroad industry. *See United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 168 (1980) (noting that the 1937 Act was intended to benefit "persons who pursued careers in the railroad industry").[18] It was "designed to provide pensions for employees 'of the Nation's railroad transportation system.' " *Id.* (quoting H. Rep. No. 1069, at

---

[17] (...continued)

> National legislative committees, general committees, insurance departments, and local lodges and divisions, established pursuant to the constitution or bylaws of such organization.

(Brackets in original).

[18] It is also apparent that the various subgroups within the statute's coverage are not necessarily exclusive.

In any event, the other subsections make evident Congress's decision to place within the railroad retirement system those employed in directly supporting the running of the interstate rail system. Our reading of the statutory language finds support as well in decisions dealing with whether a subsidiary of a railroad is an "employer." In that context, our colleagues in the District of Columbia Circuit have emphasized that "[t]he statutes require that services be performed merely 'in connection with' rail activity." *Interstate Quality Servs.*, 83 F.3d at 1464.

2 (1937)). In short, this bedrock provision makes evident that, as our colleagues in the District of Columbia Circuit have put it, the statute has a "broad purpose" and a "protective character." *Cheney R.R. Co.*, 50 F.3d at 1078. As the judges of the District of Columbia Circuit also have said, the legislative history supports a reading of the text that gives effect to Congress's clear intent that this benefit statute "be construed broadly." *Id.* at 1077-78.

Secondly, as we recognized in *Livingston Rebuild Center, Inc. v. Railroad Retirement Board*, 970 F.2d 295, 298-99 (7th Cir. 1992), the provisions of this statutory scheme are not to be constrained by the business models common at the time of the passage of the Act. Unless and until Congress deems otherwise, they are equally applicable to today's railroad industry and the organizational relationships of today's business environment, which reflect, among other factors, increased competition and the increased frequency of intrastate commuter lines sharing trackage and other facilities with participants in the Nation's interstate railway system. It is not unusual for an entity, the activities of which generally do not involve interstate transportation, to perform a particular function that is an integral part of interstate transportation by rail and that therefore is subject to the Acts.[19] The RRA may have been enacted when all

---

[19] The American Public Transportation Association, as amicus, informs us that "a commuter rail operator very often is the dispatcher of all the trains on shared track, including freight trains." Amicus Br. 4.

functions integral to interstate transportation usually were performed by carriers or their affiliates. Today, the rail transportation industry has adopted other efficiencies. Our duty nevertheless remains the same. We must apply the statute to ensure individuals performing these integral functions to interstate rail transportation are covered and thereby effectuate Congress's broad protective purpose.

Notably, in order to keep the Acts from reaching too broadly, the Board has promulgated regulations that account for entities that perform "carrier business" but are principally engaged in other business.[20] Such entities may, subject to certain considerations, be covered only with respect to those employees performing the integral functions. These regulations state that coverage will be compatible with the statutory directive only when the function performed by the entity has a direct link to the actual operation of interstate trains. Specifically, the regulation identifies a series of factors which the Board must consider in determining whether such an entity may be covered by the Acts. According to the RRB's regulation, in making such a determination, the Board considers the "history and all operations" of the company "with a view to determining whether some identifiable and separate enterprise conducted by the [company] is to be considered to be the employer." 20 C.F.R. § 202.3. The Board considers the following factors:

---

[20] The Board's authority to promulgate such regulations is found at 45 U.S.C. § 231f(b)(5).

(1) The primary purpose of the company or person on and since the date it was established;

(2) The functional dominance or subservience of its carrier business in relation to its non-carrier business;

(3) The amount of its carrier business and the ratio of such business to its entire business;

(4) Whether its carrier business is a separate and distinct enterprise.

*Id.*

This approach is certainly compatible with long-standing judicial interpretation. Ever since the Supreme Court's seminal decision in *Railroad Retirement Board v. Duquesne Warehouse Co.*, 326 U.S. 446 (1946), the key inquiry has been not whether an entity not owned by the interstate railroads provides the same service, but whether the interstate carrier could have performed the work and charged for it. *Id.* at 454; *see also Atl. Land & Improvement Co.*, 790 F.2d at 856; *R.R. Concrete Crosstie Corp. v. R.R. Ret. Bd.*, 709 F.2d 1404, 1410 (11th Cir. 1983).

Dispatching services are a necessary part of the operation of any train, including interstate trains. There is great force in the RRB's point that the Federal Railroad Administration, charged with carrying out "all railroad safety laws of the United States," 49 U.S.C. § 103(b), considers dispatching services to be central to the safe operation of a train and has described them in its own regulations in terms that underline their centrality to

train operation.[21] Interstate rail carriers can, and often do, undertake to perform this function themselves and, when they incur such an expense, can no doubt charge for it.

The Board's own administrative precedent also supports our decision. In this case, the Board relied on its earlier decision in *Employer Status Determination—S. Cal. Reg'l R. Auth., Segregation of Dispatching Dep't*, B.C.D. 02-12 (served Feb. 12, 2002). There, a governmental entity charged with the administration of commuter rail operations ("SCRRA") had contracted the operation of all trains to AMTRAK. It nevertheless became a partially covered employer when it decided to provide its own dispatching services for all traffic, interstate and intrastate, over its tracks. The Board noted that SCRRA had organized the dispatching services into a separate identifiable department that maintained strict personnel separation from the remainder of the agency's activities and that was under the sole supervision of a dispatching manager.

We cannot accept Herzog's view that an earlier decision of the STB[22] involving the same line commands an opposite result in the present case. *See City of Dallas, City of Fort Worth and D/FW RAILTRAN*, *Petition for*

---

[21] *See* note 6, supra.

[22] The *RAILTRAN* decision predated the creation of the STB and, therefore, was decided by the predecessor agency, the Interstate Commerce Commission. For ease of reading, we shall refer to its decision as that of the STB.

*Declaratory Order*, I.C.C. Fin. Docket No. 32406, 1993 WL
540395 (served Dec. 30, 1993). *RAILTRAN* concerned the
same lines involved in the present case, although under a
different structure than the current iteration. At the time
of the *RAILTRAN* decision, the cities of Dallas and Fort
Worth owned the rail line and a state administrative
agency, RAILTRAN, was tasked with the responsibility
to "preserve and manage the [line] for commuter rail
service." *Id.* at *1. Pursuant to a then-existing operating
rights agreement, a railroad company paid rent for use
of the lines and was responsible for maintenance, opera-
tion and dispatching on the line. *Id.* at *2. The cities had
the right to choose an operator who would contract
with the railroad to perform commuter rail services.
Freight operations were conducted by the railroad and
were subject to existing rights of other railroads.

The parties negotiated new agreements that modified
these existing relationships, and they sought a declara-
tory judgment from the STB about whether the pending
contractual arrangements would alter the non-carrier
status of the cities and of RAILTRAN. Under the new
agreement, the cities and RAILTRAN would have the
right and responsibility to both select and contract with
an entity or entities to operate commuter rail *and perform
dispatching* on the track.

The STB held that this proposed arrangement would not
transform the existing non-carrier status of the cities
and of RAILTRAN, because the proposal "would not
change their relationship to the line." *Id.* at *4. That is, the
cities and RAILTRAN would remain non-operating

owners who would contract with other parties to provide the commuter operations and dispatching. According to the STB, nothing in that arrangement would convert the non-operating, non-dispatching owners *themselves* into covered entities.

We acknowledge the superficial similarities in the factual background underlying both of these decisions from different administrative agencies. In each, a non-operating owner assumes responsibility for interstate railroad-related functions and contracts with a third party to execute that responsibility. Importantly, however, the agencies' inquiries focused on two different entities in these transactions and answered different questions. The STB was evaluating its jurisdiction at the request of the predecessors-in-interest of Trinity, the non-operating owner, and found that it had none. In the present case, the Board's inquiry concerned Herzog, the entity that would be *performing* the dispatching functions. The analog to Herzog in the prior STB case had not yet been identified, although the language in the opinion suggests that the parties contemplated it would be one of the interstate railroads already servicing the line. Further, to the extent that the present case *does* address Trinity itself, it reaches the same conclusion as that reached in *RAILTRAN*—that Trinity is not a covered entity. A.R. 8 ("Trinity itself is not a covered employer to the extent that the train dispatching operations conducted on Trinity's behalf [are] reported by Herzog Transit."). Indeed, these two decisions are animated by a single, consistent principle. Those entities that assume direct responsibility for the movement

of trains in interstate commerce are subject to federal regulation. Those entities whose participation in interstate commerce is indirect are not subject to the federal statutes.[23]

Here, Trinity acquired the duty to perform the dispatching function for the interstate rail operations along its tracks. It then delegated this function to Herzog, the operator of the intrastate service on its tracks. Herzog, therefore, in performing the dispatching function for the interstate freight traffic on Trinity's track, is performing the function of a common carrier in interstate commerce and is a covered employer under the statute, at least with respect to the dispatching function.

## Conclusion

The Railroad Retirement Board correctly determined that Herzog was, insofar as it performed the dispatching

---

[23] We note in passing that the STB has followed this principle when dealing directly with entities to which the dispatching function is delegated. If the pertinent agreement renders minimal the effect which the dispatching function will have on the interstate movement of trains, the STB has determined that the entity performing the function is not subject to federal regulation. *See Utah Transit Auth.—Acquisition Exemption—Union Pac. R.R. Co.,* S.T.B. Fin. Docket No. 35008, 2007 WL 2107123, at *5 (served July 23, 2007); *Los Angeles County Trans. Comm'n—Pet. for Exemption—Acquisition from Union Pac. R.R. Co.,* S.T.B. Fin. Docket No. 32375, 1996 WL 408632, at *3 (served July 23, 1996).

function for interstate trains using the tracks of Trinity, a covered employer. Accordingly, the petition for review is denied.

PETITION DENIED

SYKES, *Circuit Judge*, dissenting. An employer is covered by the Railroad Retirement and Unemployment Insurance Acts (and therefore required to contribute to these federal funds) if it is a "carrier by railroad subject to the jurisdiction of the Surface Transportation Board." 45 U.S.C. § 231(a)(1)(I) (Railroad Retirement Act); 45 U.S.C. § 351(b) (Railroad Unemployment Insurance Act). The Transportation Board's jurisdiction is limited to "transportation by rail carrier that is . . . by railroad [operating *interstate*]." 49 U.S.C. § 10501(a) (Transportation Board has jurisdiction over transportation by rail carrier that is "in the United States" and "part of the interstate rail network" or between a place in one state and a place in another state, U.S. territory, or foreign country). A "rail carrier," in turn, is defined as a "person providing common carrier railroad transportation for compensation." *Id.* § 10102(5). "Common carrier" is not defined, but as my colleagues have noted, the Transportation Board and the courts have used the common-

law definition: an entity that "holds itself out to the general public as engaged in the business of transporting persons or property from place to place for compensation." *Am. Orient Express Ry. Co.*, S.T.B. Fin. Docket No. 34502, at 4 (served Dec. 29, 2005), 2005 WL 3552968; *Am. Orient Express Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007) (affirming the Transportation Board's use of this definition).

Putting these elements together, to be covered by the Acts, an employer must provide interstate common-carrier transportation by rail. More specifically, the employer must hold itself out to the public as offering interstate passenger or freight rail transportation for a tariff. *See* Majority Op. at 14 (giving "common carrier" its common-law meaning: "an entity that holds itself out to the public as offering transportation services to all who are willing to pay its tariff").

Petitioners Dallas Area Rapid Transit ("DART") and Fort Worth Transportation Authority ("the T") are regional public-transportation authorities and political subdivisions of the State of Texas.[1] Since 1999 they have jointly owned a line of train track that runs between the cities of Dallas and Forth Worth. The cities previously owned the line, having acquired it in 1984 from the Trustee in bankruptcy for the Chicago, Rock Island and Pacific Railroad Company. *See City of Dallas, City of Fort Worth & D/FW RAILTRAN*, I.C.C. Fin. Docket

---

[1]  For ease of reference, I refer to DART and the T collectively as "DART," unless the context requires otherwise.

No. 32406 (served Dec. 30, 1993), 1993 WL 540395 (*"RAILTRAN"*). DART provides commuter rail service on the subject line marketed under the brand name "Trinity Railway Express." Herzog Transit Services, Inc., operates this service under a contract with DART. The line of track and the commuter rail service operating on it are entirely *intrastate*, running only between Dallas and Fort Worth.

Four interstate freight railroads also use this line of track pursuant to preexisting easements and related agreements that have been modified over time as the ownership of the line has transferred to Dallas and Fort Worth and then to DART. In 2001 DART expanded Herzog's contract operating responsibilities to include maintenance of the track and dispatching of all train traffic. In response to this move, and based on an inquiry from a Herzog employee, the Railroad Retirement Board opened a proceeding for an "employer status determination." In a split decision, the Board held that Herzog is a covered employer under the Acts with respect to its employees who perform dispatching services. *Emp'r Status Determination—Dec. on Recons.*, Trinity Ry. Express—Train Dispatching, Herzog Transit Servs., Inc., B.C.D. 09-53 (served Oct. 28, 2009), *available at* http://www.rrb.gov/blaw/bcd/bcd09-53.asp (last visited Oct. 12, 2010).

As my colleagues have noted, the Board's rationale was that because "[d]ispatching service is an indispensable component of carrier service and must be delivered as a part of carrier service," dispatching operations

are covered by the Acts. *Id.* at 4. The Board further held that "[w]here, as in this case, the train dispatching includes trains that operate interstate, the entity dispatching trains operates as a rail carrier within the meaning of the definition of an employer under the Railroad Retirement and Railroad Unemployment Insurance Acts." *Id.*

DART, the T, and Herzog jointly petitioned this court for review. In a scholarly opinion, my colleagues have outlined the applicable statutes and regulations and provided a thorough explanation of the historical background of the Acts. In my view this should lead us to reject the Board's decision. But my colleagues accept it and therefore deny the petition for review. I disagree. The Board's decision ignores the statutory requirements for covered-employer status under the Acts and conflicts with the Interstate Commerce Commission's ("ICC") decision in *RAILTRAN*, which addressed the common-carrier status of the predecessor operator of this very same Dallas-Fort Worth commuter rail line under similar circumstances as those presented here.

Like the Board, my colleagues rest their decision on the fact that dispatching is "a necessary and integral part" of interstate rail transportation. Majority Op. at 16. It goes without saying that a train—whether running wholly intrastate or interstate—does not move without an order from a dispatcher. But it does not follow that dispatching alone is enough to trigger covered-employer status under the Acts. Under the interlocking definitions in the statutory scheme, covered-employer status is

limited to interstate "common carriers" by rail—that is, to entities that hold themselves out to the public as providers of interstate rail transportation for passengers or freight. Providers of subsidiary services that make interstate rail transportation possible are not themselves "interstate common carriers."[2]

It makes no difference to the common-carrier analysis that DART "t[oo]k back one aspect of the right to run interstate rail operations over its lines—dispatching—and vest[ed] that right in Herzog Transit." *Id.* This analysis misconstrues the contractual arrangements among and

---

[2] There may be an exception for entities that have the power to "materially interfere" with the operations of a common carrier. The Transportation Board has strongly implied that a noncarrier with the power to "materially interfere" with the operations of a common carrier is itself subject to the jurisdiction of the Transportation Board. *See Metro-N. Commuter R.R. Co.,* S.T.B. Fin. Docket No. 34293, at 3 (served May 13, 2003), 2003 WL 21062876; *see also Md. Transit Admin.,* S.T.B. Fin. Docket No. 34975 (served Oct. 9, 2007), 2007 WL 2936134. However, the "materially interfere" inquiry is practical, not abstract, and looks to whether the noncarrier is *actually* in a position to exert meaningful negative influence over a common carrier's operations. Here, DART's agreement with Herzog significantly limited Herzog's dispatching discretion by subjecting it to the General Code of Operating Rules and establishing strict priority rules for trains running on the subject line. J.A. at 266. Herzog is therefore not in a position to materially interfere with the operations of a common carrier and is not subject to the jurisdiction of the Transportation Board under this alternative theory.

between the parties. As the owner of the line, DART had the right to dispatch trains on the track. It could perform this function itself or contractually designate another to do it—one of the freight railroads, perhaps, or Herzog or another contractor. But it is not correct to suggest that by designating Herzog to do the dispatching, DART effectively "took back one aspect of the right to run interstate rail operations over its lines" and vested it in Herzog. *Id.* The interstate freight railroads had pre-existing rights, via easement or other contracts, to run their trains on this track. DART did not "take back" these rights from them. DART owns the line but never owned interstate freight rights (or interstate passenger rights, for that matter) and never assumed responsibility for interstate rail service.

To the contrary, DART owns and through its contract partner (Herzog) operates a wholly *intrastate* commuter line. As such, neither DART nor Herzog is an interstate common carrier. If DART was dispatching the trains itself, it would not, by virtue of that function alone, become an interstate common carrier. That it assigned the dispatching function to Herzog does not make Herzog an interstate common carrier, either.

This was essentially the holding in *RAILTRAN,* a 1993 decision by the ICC (the predecessor to the Transportation Board) in a case involving the cities of Dallas and Forth Worth and this very same commuter rail line. The cities had formed RAILTRAN to manage and operate the line for commuter rail service and were in the process of restructuring their contractual arrangements

with the interstate freight carriers that also used the corridor. They sought a declaratory order from the ICC on the question whether RAILTRAN or the cities would become common carriers (and therefore covered employers under the Acts) if they assumed certain functions—including dispatching—necessary to operate the line. The ICC held that the proposed agreements would not trigger its jurisdiction; the agreements, the agency held, "will not change the non-carrier status" of RAILTRAN or the cities. *RAILTRAN*, I.C.C. Fin. Docket No. 32406, 1993 WL 540395, at *4. The agreements "would permit [the cities or RAILTRAN] to select a Designee to perform certain contract duties such as maintenance, dispatching and operational control" of the line, "[b]ut . . . that authority would not change their relationship to the line." *Id.* The ICC concluded that the cities and RAILTRAN "will not become common carriers under the Act by executing or carrying out [the proposed agreements], or by contracting for an Operator to provide rail commuter service or Designee to dispatch and/or maintain the Corridor for joint use." *Id.* at *5. The ICC further concluded that its authorization was not required (that is, its jurisdiction would not be triggered) if RAILTRAN were to "dispatch or maintain the Corridor [itself] or to select a Designee other than [one of the interstate freight carriers] to perform this function." *Id.*

*RAILTRAN*, it seems to me, is directly on point. Its holding, as applied here, means that DART's assignment of the dispatching function to Herzog does not make *either* DART *or* Herzog an interstate common carrier subject to the Transportation Board's jurisdiction. It is true that

the petitioners did not alert the Board to the *RAILTRAN* decision during the agency proceedings. But the Board has not relied on waiver doctrine and instead has devoted considerable space in its appellate brief to discussing this case. Despite its length, however, the Board's discussion of *RAILTRAN* has not persuasively distinguished it.

Because the Board's decision fails to apply the statutory standards for covered-employer status under the Acts and conflicts with the ICC's decision in *RAILTRAN*, I would grant the petition for review and reverse. Accordingly, I respectfully dissent.